UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles DAVIS aka Marcus Anderson,
Defendant-Appellant.

No. 71–2993.

United States Court of Appeals,
Ninth Circuit.

June 29, 1973.

John Keker, Asst. Federal Public Defender (argued), James F. Hewitt, Federal Public Defender, Earle Partington, Asst. Federal Public Defender, San Francisco, Cal., for defendant-appellant.

James L. Hazard, Asst. U. S. Atty. (argued), James L. Browning, U. S. Atty., F. Steele Langford, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before KOELSCH, BROWNING, and GOODWIN, Circuit Judges.

## OPINION

BROWNING, Circuit Judge:

Appellant was convicted of attempting to board an aircraft while carrying a concealed weapon (49 U.S.C. § 1472($l$)). The conviction was based upon the discovery of a loaded revolver in appellant's briefcase by a Trans World Airlines employee during a search of the carry-on luggage of boarding passengers. Appellant's motion to suppress was denied on the grounds that he "impliedly consented" to the search and that, in any event, "there was no governmental involvement."

We hold that the United States was sufficiently implicated in this airport screening search to require that it be conducted in compliance with the Fourth Amendment. We hold further that while airport screening searches per se do not violate a traveler's rights under the

Fourth Amendment, or under his constitutionally protected right to travel, such searches must satisfy certain conditions, among which is the necessity of first obtaining the consent of the person to be searched. A remand is necessary in this case to determine whether appellant gave such consent.

On March 16, 1971, appellant and a friend checked in a few minutes before TWA Flight 743's scheduled 6:50 p. m. departure from San Francisco International Airport for Bangkok, Thailand, with an intermediate stop in Los Angeles. Appellant was ticketed for Los Angeles.

As appellant approached the loading gate, Malcolm Read, a TWA employee, told him that a routine security check was necessary, reached for his briefcase, opened it, and found a gun.[1] Mr. Read handed the gun to Donald Graub, a United States Customs Service security agent who had been standing some six feet away. Mr. Graub found the gun to be loaded. Mr. Read, Mr. Graub, and United States Deputy Marshal Douglas Aaron, who had been standing with other deputy marshals about 15 feet away, thereupon escorted appellant to a nearby room where the officials conducted a search of appellant's person. Following the search, Deputy Marshal Aaron formally took both appellant and the gun into custody.

Appellant was charged with a minor offense under 49 U.S.C. § 1472(*l*). He pleaded not guilty and filed a motion to suppress. An evidentiary hearing was held before a United States magistrate on both the motion to suppress and the general issue of guilt or innocence. The motion to suppress was denied on a finding of implied consent. Appellant was found guilty and sentenced to pay a fine of $250.[2]

Appellant appealed to the district court (18 U.S.C. § 3402; Rule 8(d), Rules of Procedure for the Trial of Minor Offenses before United States Magistrates), urging error in the denial of the motion to suppress. The district court affirmed, concurring in the magistrate's finding of consent, and adding, as an alternate ground, that there was no governmental involvement in the search.

I

We consider first whether the United States was sufficiently involved to subject the search to the limitations of the Fourth Amendment.

■ "[S]earch is a functional, not merely a physical, process." Lustig v. United States, 338 U.S. 74, 78, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949). A search begins with the planning of the invasion and continues "until effective appropriation" of the fruits of the search "for subsequent proof of an of-

---

[1.] Mr. Read testified that he told appellant a search would have to be made, and that he simultaneously reached for the briefcase. Appellant "didn't fight to keep the . . . case. . . . I think [the transfer of the briefcase] . . . was mutual." "I took it from [his] . . . hand because he didn't put up any . . . didn't disagree at all. It's a mutual thing where the grab starts and where the giving of the thing up ends, I guess."

Although Mr. Read testified at one point that "at the same time" he asked for Davis's briefcase, Davis "handed" it to him, he clarified this under cross-examination by admitting that Davis "really didn't do much of anything." Mr. Read "just took the bag from his hand as he was standing there," as "probably a

hundred people before . . . [Davis] had done on that same night."

At the suppression hearing, appellant's counsel offered to place appellant on the stand to testify that the briefcase "was taken from his hand, opened before he had a chance to really do or think anything." The court responded: "That seems to be the present posture of the evidence." Based upon the court's evaluation of the state of the record, appellant did not testify.

[2.] The record disclosed that appellant was engaged in drug rehabilitation work and had acquired the weapon discovered in his briefcase for self-protection, after being exposed to sniper fire on two occasions as a result of his work.

fense." *Id.* The Fourth Amendment applies to a search whenever the government participates in any significant way in this total course of conduct. "The decisive factor . . . is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means." *Id.* at 79, 69 S.Ct. at 1374.[3]

■ The search of appellant's briefcase was not an isolated event. It was part of a nationwide anti-hijacking program conceived, directed, and implemented by federal officials in cooperation with air carriers.

The major governmental effort to meet the threat of hijacking began in late 1968, when hijacking of commercial aircraft reached serious proportions, and intensified steadily thereafter.

Various techniques for the surveillance and search of potential air passengers have been a part of that effort. At no time since late 1968 could activities of this kind at the nation's airports have been described accurately as "an independent investigation by the carrier for its own purposes," Gold v. United States, 378 F.2d 588, 591 (9th Cir. 1967), and thus beyond the reach of the Fourth Amendment. The United States has "significantly involved itself" in airport searches from the beginning. Reitman v. Mulkey, 387 U.S. 369, 380, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967).

The first hijacking of an American commercial aircraft occurred in 1961.[4] Congress responded by passing a statute making aircraft hijacking and certain related activities federal crimes.[5] The statute also authorizes certain relevant conduct by the individual carriers: "Subject to reasonable rules and regulations prescribed by the [Federal Aviation] Administrator, any air carrier is authorized to refuse transportation to a passenger or to refuse to transport property when, in the opinion of the air carrier, such transportation would or might

3. *See* Corngold v. United States, 367 F.2d 1, 5–6 (9th Cir. 1966) ; *see also* Byars v. United States, 273 U.S. 28, 32–34, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

The government has suggested no reason why the rules applied in distinguishing private action from action by a state under the Fourteenth Amendment should not also be applicable in distinguishing private action from action by the United States under the Fourth Amendment. *See, e. g.,* Note, Private Assumption of the Police Function under the Fourth Amendment, 51 B.U.L.Rev. 464, 474–75 (1971) ; Note, Airport Security Searches and the Fourth Amendment, 71 Colum.L.Rev. 1039, 1044–47 (1971). *But see id.* at 1046 & n. 40.

Speaking in the Fourteenth Amendment context, the Supreme Court recently said : "[T]he question of whether particular . . . conduct is private, on the one hand, or amounts to 'State action,' on the other hand, frequently admits of no easy answer. 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'" Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), *quoting* Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.

2d 45 (1961). However, "there is 'state action' whenever the 'State has so far insinuated itself into a position of interdependence [with the otherwise "private" person whose conduct is said to violate the Fourteenth Amendment] . . . that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.'" United States v. Price, 383 U.S. 787, 794–795 n. 7, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966), *quoting* Burton v. Wilmington Parking Authority, *supra*, 365 U.S. at 725, 81 S.Ct. 856.

4. *See* J. Arey, The Sky Pirates 49–55 (1972). For a comprehensive table of all hijacking attempts from 1930 to mid-1971, *see id.* at 315–54. Hijackings from May 1961 to March 1972 are tabulated in S. Rep. No. 93–13, 93d Cong., 1st Sess., at 45–50 (1973). For a general summary of this history as it affected the United States, *see* McGinley & Downs, Airport Searches and Seizures—A Reasonable Approach, 41 Ford.L.Rev. 293, 294–297 (1972).

5. Pub.L. 87–197, sec. 1 ; 49 U.S.C. § 1472 (i)–(m), as amended.

be inimical to safety of flight." [6] This statute, and related rules issued under the regulatory authority of the Administrator,[7] provide the basis for the anti-hijacking program.

In 1963 the United States joined in the Tokyo Convention, an international agreement addressed to some of the jurisdictional problems involved in international hijackings.[8] Little more occurred, however, until 1968.

Between 1961 and 1968, hijackings of United States aircraft averaged about one per year. In 1968, however, the number rose to 18. In 1969 there were 40 attempted hijackings of United States aircraft, 33 successful.[9]

Spurred by these events, the United States entered into additional international conventions aimed at solving complications left unresolved by the earlier Tokyo Convention.[10] It also undertook domestic action to avert further hijacking episodes.

Beginning in October 1968, a Federal Aviation Administration task force, including representatives of the Department of Justice and the Department of Commerce, compiled a "profile" of objective characteristics to identify potential hijackers.[11] In December 1968, the Federal Aviation Administration held an intensive high-level symposium on the development of devices for the screening of individuals for possession of concealed weapons.[12] The FAA Task Force, working in cooperation with the carriers, then developed the initial anti-hijacking "system."

Although the specific elements varied over a period of time, the system generally included, first, the use of the "profile," next, the use of a magnetometer to detect the presence of metal on any prospective passenger who met the "profile," and finally, a weapons search of the carry-on luggage and/or person of anyone who activated the magnetometer.[13]

6. Pub.L. 87–197, sec. 4; 49 U.S.C. § 1511.

7. Statutes conferring authority upon the Administrator to issue appropriate regulations include the following:

49 U.S.C. § 1354(a) authorizes the Administrator to issue such orders and make such rules, regulations, and procedures "as he shall deem necessary to carry out the provisions of" the Federal Aviation Act.

49 U.S.C. § 1421(a)(6) authorizes the Administrator to prescribe "such reasonable rules and regulations, or minimum standards, governing other practices, methods, and procedures, as the Administrator may find necessary to provide adequately for national security and safety in air commerce."

49 U.S.C. § 1424 empowers the Administrator to issue air carrier operating certificates "and to establish minimum safety standards for the operation of the air carrier to whom any such certificate is issued."

8. Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963 [1969] 3 U.S.T. 2941, T.I.A.S. No. 6768.

9. See McGinley & Downs, supra note 4, at 294–295.

10. The Hague Convention for the Suppression of Unlawful Seizure of Aircraft 1970, providing for mandatory punishment or extradition of hijackers, was ratified by the Senate on Sept. 8, 1971. 117 Cong.Rec. 13,894–13,895 (daily ed. Sept. 8, 1971). The Montreal Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation was ratified on Oct. 3, 1972. 118 Cong.Rec. 16,651–16,653 (daily ed. Oct. 3, 1972).

11. See, e. g., McGinley & Downs, supra note 4, at 302.

12. See FAA Report on Detection Devices, in Hearings on Aviation Safety and Aircraft Piracy Before the H. Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess., at 98–102 (Feb. 5, 1969).

13. See, e. g., United States v. Lopez, 328 F.Supp. 1077, 1082–1084 (E.D.N.Y. 1971); McGinley & Downs, supra note 4, at 301–06; J. Arey, The Sky Pirates 234–46 (1972); Hearings on Aircraft Hijacking Before the H. Comm. on Foreign Affairs, 91st Cong., 2d Sess., at 80 (Sept. 23, 1970) (statement of Hon. James M. Beggs, Under Secretary of Transportation) [hereinafter referred to as Aircraft Hijacking Hearings].

The FAA and the airlines worked together to put the system into operation at the nation's airports.[14] As a part of this cooperative effort, United States deputy marshals and Customs Service agents were made available to carry out searches and make arrests.[15] By September 1970, approximately 400 United States deputy marshals were assigned to surveillance and search activities at airport boarding gates.[16]

On September 11, 1970, the President of the United States announced "A Program to Deal with Airplane Hijacking." Pertinent excerpts appear in the margin.[17] The President "directed" the Department of Transportation to have airlines extend the use of surveillance equipment and techniques to all appropriate airports in the United States. The President further stated that "the federal government will pro-

14. General Clifton F. Von Kann, Vice President of Operations & Engineering for the Air Transport Association of America testified before the House Committee on Foreign Relations in September 1970: "The airlines worked with the government in an intensified effort to develop detection capabilities by which would-be hijackers could be spotted and prevented from boarding the plane. This resulted in the development of techniques using a descriptive profile to spot would-be hijackers and the magnetometer to help spot unusual concentrations of metal on people boarding airliners." Aircraft Hijacking Hearings at 44.

General Von Kann further testified that as political hijackings increased, "the airlines working together with FAA intensified the detection program, arranged with airport operators to procure detection equipment as rapidly as it could effectively be operated, and participated in a demonstration at New Orleans in which the entire airport was organized for full screening of all passengers." Id. at 45.

See also id. at 71 (testimony of Walter Jensen, Ass't V. P. of Operations & Engineering, Air Transport Association of America).

See note 26, infra.

15. See, e. g., Aircraft Hijacking Hearings at 80, 92 (statement and testimony of Hon. James M. Beggs, Under Secretary of Transportation).

16. See Hearings on Revenue Aspects of the Administration Antihijacking Proposal Before the H. Comm. on Ways and Means, 91st Cong., 2d Sess., at 45 (Sept. 21, 1970) (statement of Hon. Claude Pepper).

17. 1970 Public Papers of Presidents of the United States: Richard Nixon 742–43 (G.P.O.1971):
"The menace of air piracy must be met—immediately and effectively. I

am therefore announcing the following actions to deal with this problem:
* * * * *
2. I have directed the Department of Transportation to have American flag carriers extend the use of electronic surveillance equipment and other surveillance techniques to all gateway airports and other appropriate airports in the United States and—wherever possible—in other countries. The Federal Government will provide enforcement officers to work with this equipment, to conduct searches when appropriate, and to make necessary arrests. Such equipment and techniques have already helped to reduce the problem of air piracy in many areas.
3. I have directed the Departments of Transportation, Treasury, and Defense, the Central Intelligence Agency, the Federal Bureau of Investigation, the Office of Science and Technology, and other agencies to accelerate their present efforts to develop security measures, including new methods for detecting weapons and explosive devices. At the same time, the Departments of Defense and Transportation will work with all U. S. airlines in determining whether certain metal detectors and x-ray devices now available to the military could provide immediate improvement in airport surveillance efforts. To facilitate passenger surveillance, appropriate agencies of the Federal Government will intensify their efforts to assemble and evaluate all useful intelligence concerning this matter and to disseminate such information to airlines and law enforcement personnel.
* * * * *
. . . . The Secretary of Transportation will direct this program and take responsibility for preparing further proposals. In this capacity he will work closely with the Secretary of State, the Secretary of the Treasury, the Attorney General, and the Secretary of Defense."

vide enforcement officers to work this equipment, to conduct searches when appropriate, and to make necessary arrests." [18]

Although "prepared to require it absolutely by rule," the Department of Transportation continued for a time to employ informal means to obtain the cooperation of air carriers.[19] By September 1971, however, the FAA had concluded that voluntary cooperation "had not satisfactorily provided . . . [the] needed protection in many instances," and proposed a new rule requiring all air carriers to submit a screening program to the FAA for approval.[20] On February 1, 1972, the FAA issued a rule requiring air carriers to adopt and put into use within 72 hours a screening system "acceptable" to the FAA "to prevent or deter the carriage aboard its aircraft of sabotage devices or weapons in carry-on baggage or on or about the persons of passengers." [21] This system was to require the screening of *all* airline passengers "by one or more of the following systems: behavioral profile, magnetometer, identification check, physical search." [22]

18. The search of appellant's briefcase occurred six months later. Government agents were then sharing the task of conducting the pre-boarding searches with TWA personnel. As Mr. Read testified: "Originally, we handled it completely, and then we got the customs and the Marshal's service out there and they handle it in conjunction with us and we both now handle them. When they have enough people they handle it completely. When they don't I supply the people or I do it myself." On this particular flight, "several" federal officers had participated in the searching of carry-on luggage. It was basically appellant's late arrival that determined the nature of his particular "searcher"; no more passengers had been expected, and the federal officers had moved a short distance away. Mr. Read testified that if appellant had arrived ten minutes earlier, the deputy marshals would have been in the gateway and probably would have conducted the search, though "had I been standing there and they had two other or three other people in front of them I would have searched them."

19. *See* Aircraft Hijacking Hearings at 101 (testimony of Under Secretary of Transportation James A. Beggs): "We are prepared to require it absolutely, by rule. But we would like to try the system as we have been working it." *But see id.* at 85 (statement of John R. Stevenson, legal advisor to the State Dep't): "U. S.-flag carriers *have been directed*" to comply with the President's 7-point program (emphasis added). Also, Under Secretary of Transportation Beggs referred to the President's "request" for additional guards and the expansion of aircraft surveillance as a "requirement." *See id.* at 89.

20. *See* 36 Fed.Reg. 19173–74 (Sept. 30, 1971) (proposing new rule 14 C.F.R. § 121.538). *See also id.* at 19172–73 (proposing new rule 14 C.F.R. § 107, directed to airport operators).

Neither of these new regulations, either as proposed or as eventually adopted, set out the specific anti-hijacking procedures to be followed. The FAA used two other methods to control these procedures. First, the new regulations required each carrier and airport operator to file its own "security program" with the FAA, containing provisions "acceptable" to the Administrator. The air carriers were apparently informed through unpublished directives what provisions would be "acceptable." And second, sub section (g) (1) of the new 14 C.F.R. § 121.538 authorized the Administrator to make direct amendments to the various filed security programs. Beginning on July 18, 1972, a number of such amendments were made by telegram from the Administrator to the airlines and various FAA regional directors. The public was advised of these directives and amendments through Department of Transportation and FAA press releases. Because much of this material is unavailable in law libraries, substantial portions are set out in footnotes to this opinion.

21. *See* 37 Fed.Reg. 2500–01 (Feb. 2, 1972) (adopting proposed rule 14 C.F.R. § 121.538 in part).

22. *See* FAA Press Release No. 72–26 (Feb. 6, 1972):

"Secretary of Transportation John A. Volpe announced today that 200 FAA security officers have been ordered into the field to assist with implementation of a new regulation requiring mandatory screening of all airline passengers before flight.

In July 1972, the President "ordered" the screening of all passengers and inspection of all carry-on baggage on all "shuttle-type" flights.[23] On August 1, 1972, the FAA issued a directive that no airline "shall permit any person" meeting the profile to board a plane unless his carry-on baggage had been searched and he had been cleared through a metal detector or had submitted to a "consent search" prior to boarding.[24] On December 5, 1972, the FAA ordered that searches of all carry-on items and magnetometer screening of *all* passengers be

The new FAA regulation—which went into effect at 12 midnight Saturday—applies to all scheduled flag, domestic and intrastate air carriers. They are required to screen all passengers on all flights using one or more of the following systems: behavorial profile, magnetometer, identification check, physical search.

Secretary Volpe said the FAA security officers will visit 123 airports this week to assist airline station managers in establishing an effective screening system. He noted that these 123 airports account for 95 percent of all passenger enplanements in the United States, thus assuring blanket coverage. 'FAA has ordered the airlines to screen all passengers on all flights because we believe—and always have—that the best place to stop a hijacking is at the aircraft boarding gate,' the Secretary said."

23. *See* Statement of Secretary of Transportation John A. Volpe before the Subcommittee on Aviation of the Senate Committee on Commerce (Jan. 10, 1973). The directive read in part:
"FOR 100% PASSENGER SCREENING OF NON-RESERVATION (SHUTTLE) TYPE FLIGHTS, THE FOLLOWING ARE MINIMUM ACCEPTABLE PROCEDURES, EFFECTIVE IMMEDIATELY.
1. *WHERE METAL DETECTORS ARE AVAILABLE.*
A. EACH CERTIFICATE HOLDER SHALL PREVENT THE CARRIAGE ABOARD ITS AIRCRAFT OF BAGGAGE ON OR ABOUT THE PERSON OF PASSENGERS UNLESS THAT BAGGAGE HAS BEEN EXAMINED BY A RESPONSIBLE REPRESENTATIVE OF THE CERTIFICATE HOLDER OR A LAW ENFORCEMENT OFFICER AND,
B. THE CERTIFICATE HOLDER SHALL REQUIRE EACH PASSENGER TO CLEAR THROUGH A METAL DETECTOR WITHOUT INDICATION OF UNACCOUNTED FOR METAL ON HIS PERSON PRIOR TO BOARDING.
2. *WHERE METAL DETECTORS ARE NOT AVAILABLE*

A. EACH CERTIFICATE HOLDER SHALL PREVENT THE CARRIAGE ABOARD ITS AIRCRAFT OF BAGGAGE ON OR ABOUT THE PERSON OF PASSENGERS UNLESS THAT BAGGAGE HAS BEEN EXAMINED BY A RESPONSIBLE REPRESENTATIVE OF THE CERTIFICATE HOLDER OR A LAW ENFORCEMENT OFFICER AND,
B. THE CERTIFICATE HOLDER SHALL REQUIRE EACH PASSENGER TO PRESENT TWO ACCEPTABLE FORMS OF IDENTIFICATION.
C. IN THE CASE OF A PASSENGER WHO DOES NOT PROVIDE ADEQUATE IDENTIFICATION, THE CERTIFICATE HOLDER MAY REQUEST THAT PASSENGER TO SUBMIT TO A CONSENT SEARCH OF HIS PERSON AND,
D. THE CERTIFICATE HOLDER SHALL DENY BOARDING TO EACH PASSENGER WHO FAILS TO COOPERATE.
THE ABOVE PROCEDURES MUST BE INCLUDED IN THE SECURITY PROGRAMS OF THE AFFECTED AIR CARRIERS. PRINCIPAL SECURITY AGENTS SHOULD IMMEDIATELY NOTIFY THE CARRIERS OF THE PROCEDURAL CHANGES INDICATED ABOVE."
FAA Telegram of July 18, 1972.

24. *See* DOT [Dep't of Transportation] Press Release No. 72-72, Aug. 1, 1972. The directive read in part:
"BECAUSE OF THE CONTINUING MENACE OF AIR PIRACY AND OTHER CRIMES ABOARD AIRCRAFT AND BECAUSE OF THE SERIOUS NATURE OF THIS THREAT TO THE SAFETY OF PERSONS AND PROPERTY, I FIND THAT AN EMERGENCY EXISTS REQUIRING IMMEDIATE ACTION WITH RESPECT TO SAFETY IN AIR COMMERCE. THEREFORE, SECURITY PROGRAMS ACCEPTABLE TO THE ADMINISTRATOR UNDER SECTION 121.538(b) OF THE FEDERAL AVIATION REGULATIONS (FAR'S) AND SECURITY PROGRAMS APPROVED UNDER

instituted by January 5, 1973.[25] Routine screening and searching under this procedure was to be conducted by airline personnel, but in the presence of armed law enforcement officers "(1) Authorized to carry and use firearms," and "(2) Vested with a police power of arrest under Federal, State, or other political subdivision authority." [26]

The search in the instant case occurred on March 16, 1971—after the President's directive of September 1970, but before the issuance of formal regulations mandating pre-boarding search-

SECTION 121.538(c) OF THE FAR'S ARE AMENDED TO INCLUDE THE FOLLOWING MINIMUM ACCEPTABLE PROCEDURES, EFFECTIVE IMMEDIATELY.

1. NO CERTIFICATE HOLDER SHALL PERMIT ANY PERSON WHO HAS BEEN IDENTIFIED AS A SELECTEE UNDER ITS SECURITY PROGRAM INCLUDING ADULT, CHILDREN AND INFANT PASSENGERS TRAVELING IN HIS COMPANY TO BOARD ITS AIRCRAFT, UNLESS—

A. THE CARRY-ON BAGGAGE AND OTHER ARTICLES ON OR ABOUT THE PERSON OF EACH PASSENGER HAS BEEN SEARCHED AND,
B. THE CERTIFICATE HOLDER HAS REQUIRED EACH PASSENGER TO CLEAR THROUGH A METAL DETECTOR WITHOUT INDICATION OF UNACCOUNTED FOR METAL ON HIS PERSON OR
C. IN THE ABSENCE OF A METAL DETECTOR, EACH PASSENGER HAS SUBMITTED TO A CONSENT SEARCH PRIOR TO BOARDING.

2. ALL PREVIOUSLY ISSUED GUIDELINES OR INSTRUCTIONS CONCERNING THE SCREENING OF SELECTEES WHICH ARE IN CONFLICT WITH THE FOREGOING ARE CANCELLED EFFECTIVE IMMEDIATELY.

3. PREVIOUSLY ISSUED GUIDELINES AND INSTRUCTIONS CONCERNING THE SCREENING OF OTHER THAN SELECTEES ARE NOT EFFECTED."

FAA Telegram of Aug. 1, 1972.

On Sept. 17, 1972, the FAA awarded contracts for 1,090 walk-through and 1,200 hand-held passenger screening devices for use at the nation's airports. *See* FAA Press Release No. 72–181, Sept. 17, 1972.

25. *See* DOT Press Release No. 103–72, Dec. 5, 1972. The directive read in part: "BECAUSE OF THE CONTINUING MENACE OF AIR PIRACY AND OTHER CRIMES ABOARD AIRCRAFT AND BECAUSE OF THE SERIOUS NATURE OF THIS THREAT TO THE SAFETY OF PERSONS AND PROPERTY, I FIND THAT AN EMERGENCY EXISTS REQUIRING IMMEDIATE ACTION WITH RESPECT TO SAFETY IN AIR TRANSPORTATION AND AIR COMMERCE. THEREFORE, IN ACCORDANCE WITH SECTION 121.538, THE SECURITY PROGRAM APPROVED UNDER 121.538 OF THE FEDERAL AVIATION REGULATIONS, IS HEREBY AMENDED EFFECTIVE 1/5/73 WITHOUT STAY, TO INCLUDE THE FOLLOWING MINIMUM ACCEPTABLE PROCEDURES.

1. THE CERTIFICATE HOLDER SHALL NOT PERMIT ANY PASSENGER TO BOARD ITS AIRCRAFT UNLESS:

A. THE CARRY-ON BAGGAGE ITEMS ARE INSPECTED TO DETECT WEAPONS, EXPLOSIVES, OR OTHER DANGEROUS OBJECTS, AND

B. EACH PASSENGER IS CLEARED BY A DETECTION DEVICE WITHOUT INDICATION OF UNACCOUNTED FOR METAL ON HIS/HER PERSON (HAND-HELD DETECTION UNITS MAY BE USED UNTIL WALK-THROUGH UNITS ARE AVAILABLE), OR

C. IN THE ABSENCE OF A DETECTOR, EACH PASSENGER HAS SUBMITTED TO A CONSENT SEARCH PRIOR TO BOARDING.

2. AMENDED SECURITY PROGRAMS MUST BE SUBMITTED TO THE PRINCIPAL SECURITY AGENT ASSIGNED TO THE CERTIFICATE HOLDER NO LATER THAN 1/5/73.

3. ANY PROVISIONS OF THE SECURITY PROGRAM IN CONFLICT WITH THE FOREGOING ARE CANCELED EFFECTIVE 1/5/73."

FAA Telegram of Dec. 5, 1972.

26. *See* 37 Fed.Reg. 25934–35 (Dec. 6, 1972). The validity of this regulation is currently the subject of litigation. *See* Airport Operators Council Int'l v. Shaffer, 354 F.Supp. 79 (D.D.C.1973) (denying preliminary injunction), aff'd and re-

manded in unpublished memorandum, Feb. 15, 1973 (D.C.Cir.).

In announcing the changes, Secretary of Transportation John A. Volpe shed additional light on the overall program:

"I have been directed by the President to institute immediately new security procedures at the Nation's airports to further protect American air travelers against threats and acts of violence by air hijackers.

Accordingly I have instructed the Federal Aviation Administrator to issue immediately an emergency order and to amend procedures under existing regulations to carry out the intent of the President's directive. The action will have the effect of tightening security at all the Nation's 531 airports which serve scheduled air carriers. It will also increase the security on all scheduled U. S. carrier flights originating abroad.

Under the emergency order airport operators will be required to station armed local law enforcement officers at passenger checkpoints during periods when passengers are boarding or reboarding. Through amendment of procedures already in force under existing regulations, all passengers must be screened electronically as a condition for boarding or reboarding. These revised procedures also will require all carry-on luggage and other items accessible to passengers during flight be inspected prior to boarding.

The new security measures regarding the electronic screening of all passengers and the inspection of their luggage require implementation not later than January 5, and the responsibility for carrying them out will be that of the air carriers. The emergency rule requiring the stationing of armed guards at passenger checkpoints by airport operators requires the operators to submit their plans within 30 days and to be in full compliance no later than 60 days.

\* \* \* \* \*

Through Presidential directives and resulting actions by the Department and the air transport industry, much has been done since the onset of the current wave of air piracy to curb these criminal acts. A cooperative Government-industry program for screening passengers and protecting aircraft from extortionists has been established.

Electronic screening devices of some type are now available at all airports affected by the new orders. The Department of Transportation has purchased 1,100 walk-through metal detectors and 1,185 hand-held units, and is prepared to buy enough additional walk-through screening devices to equip all airports. The program established by the President in September 1970 has provided 1,500 Federal officers to enforce security at 40 of the country's larger airports, and local law officers have provided similar protection at more than 80 other airports."

*See* DOT Press Release 103–72, Dec. 5, 1972.

In a statement before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, on Tuesday, Feb. 27, 1973, Under Secretary of Transportation Egil Krogh, Jr., summarized the development of the anti-hijacking program in the following language:

"During this period of hijacking attempts, the Federal Government has developed varied responses to meet this danger. Initially, in response to the attempts of politically motivated hijackers, the FAA developed a 'profile' by which airline personnel could identify potential hijackers. In September 1970, after Palestinian guerrillas seized and destroyed several American and foreign aircraft, the President directed Federal law enforcement personnel to ride on American air carrier flights over international routes. In February 1972 the airlines were ordered by the FAA to use a profile to screen all passengers. In July of last year the President ordered the screening of all passengers and inspection of carry-on baggage on all 'shuttle-type' flights. And, in August the FAA required the air carriers to search all profile selectees and all persons in their party and to inspect their carry-on baggage before permitting them to board an aircraft.

However, the Houston and Birmingham incidents called for the further tightening of security. The threat of future incidents of a similar high violence character warrants continuing these measures. Where a simple screening of a selected few passengers might have deterred hijackers in earlier years, we now must be ready to forcefully stop them at the boarding gate and deny them access to the ramp area. Our program has three basic objectives: first, to keep unauthorized persons from boarding an aircraft in possession of a deadly weapon; second, to prevent sabotage devices from being carried or placed aboard these aircraft; and finally, to insure that the airport operators serving these aircraft have maintained a proper level

es.[27] It is entirely clear from the materials summarized above, however, that throughout the period since late 1968 the government's participation in the development and implementation of the airport search program has been of such significance as to bring any search conducted pursuant to that program within the reach of the Fourth Amendment.[28]

The government's role in the airport search program is and has been a dominant one. But even if governmental involvement at some point in the period could be characterized accurately as mere "encouragement," or as "peripheral, or . . . one of several cooperative forces leading to the [alleged] constitutional violation," see United States v. Guest, 383 U.S. 745, 755–756, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966), that involvement would nevertheless be "significant" for purposes of the Fourth Amendment. Constitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by "private" persons or entities that is prohibited to the government itself.[29]

■ It makes no difference that the act of opening appellant's briefcase was accomplished by a "private" airline employee rather than a "public" official. The search was part of the overall, nationwide anti-hijacking effort, and constituted "state action" for purposes of the Fourth Amendment.

## II

The government argues that the search of appellant's briefcase was consistent with the Fourth Amendment (1) because appellant did not have a reasonable expectation of privacy with respect to his carry-on luggage, citing Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), and (2) because "a police officer is not required to have probable cause for arrest before he can seize a person and subject him to a limited search for weapons," citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The search cannot be justified on either ground.

■ Katz states a threshold test. Its purpose is to determine whether a given intrusion is subject to the Fourth Amendment. If the complaining individual did not have a reasonable expectation of privacy with regard to the intru-

---

of security in operating areas. To achieve these goals, we have required the action I described a few minutes ago: electronic screening of all passengers, a physical inspection of all carry-on articles, and the presence of armed law enforcement officers at the boarding gates.

As I stated earlier, under our program airport operators were required to submit by January 6 their plans for providing the requisite law enforcement personnel and by February 6 to have these officers in place at their airports."

For intermediate steps in the development of the FAA rules, see 37 Fed.Reg. 4904–05 (Mar. 7, 1972) (amending 14 C.F.R. § 121.538 to complete the proposed rulemaking on that section); 37 Fed. Reg. 5254 (Mar. 11, 1972) (making 14 ·C.F.R. § 121.538 effective immediately); 37 Fed.Reg. 5689–91 (Mar. 18, 1972) (making proposed Rule 14 C.F.R. § 107 effective immediately); 37 Fed.Reg. 7150 (Apr. 11, 1972) (supplying certain lan-

guage "inadvertently omitted" from 14 C.F.R. § 121.538).

27. Referring to this period in a statement issued Mar. 9, 1972, the President said, "Eighteen months ago, I ordered comprehensive, forceful action to halt the wave of criminal incidents on U. S. flag aircraft. The sky marshal and passenger screening programs conducted jointly with Government and the airlines since that time have progressively reduced the hijacker's chances of success." See 1972 Weekly Comp. of Pres. Docs. at 553.

28. See McClintock, Skyjacking: Its Domestic and Criminal Ramifications, 39 J. Air L. & Comm. 29, 67 (1973); note 3, supra, and related text.

29. Cf. Note, Private Assumption of the Police Function under the Fourth Amendment, 51 B.U.L.Rev. 464, 473 (1971), discussing Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927); see also Corngold v. United States, 367 F.2d 1, 5–6 (9th Cir. 1966).

sion, the Fourth Amendment is inapplicable; if he did have a reasonable expectation of privacy, however, the government must demonstrate that the intrusion was justified under Fourth Amendment standards.

As interpreted by Justice Harlan (an interpretation the government urges but that we do not necessarily accept [30]), *Katz* imposes "a twofold requirement [for Fourth Amendment protection], first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

Clearly the first requirement was satisfied in this case: appellant relied on the privacy of his briefcase to conceal his gun.

The second requirement was also satisfied. This requirement does not mean that any kind of governmental intrusion is permissible if it has occurred often enough. The government could not avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped, or that all homes would be searched. "Airport searches" are not outside the Amendment simply because they are being conducted at all airports. In none of the Supreme Court decisions excluding searches or seizures from the Fourth Amendment on the authority of *Katz* was the result based on such a rationale. Rather, in each case the individual's alleged reasonable expectation of privacy was negated on some ground independent of the frequency of the challenged intrusion itself.[31] There is no such independent ground in this case.

■■ *Terry* along with its companion case Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and the more recent Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), is also inapposite to the validity of pre-boarding screening searches of passengers and luggage.[32]

---

30. Justice Harlan's first condition would not appear to be universally applicable. The traditional protection afforded to the home under the Fourth Amendment could not be denied to a particular homeowner because he mistakenly supposed that government agents might enter whenever they pleased.

31. *See, e. g.,* Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (taxpayer has no reasonable expectation of privacy as to tax records delivered to an independent accountant since the accountant necessarily had discretion as to what information to disclose); United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972) (witness legitimately called before a grand jury cannot object on Fourth Amendment grounds to demand for voice recording, since such a witness has no reasonable expectation of privacy regarding his voice, a publicly-exposed physical characteristic); United States v. Mara, 410 U.S. 9, 93 S.Ct. 774, 35 L.Ed.2d 99 (1972) (same re: handwriting exemplars); *cf.* United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (inspections of business premises of federally licensed firearms dealer "pose only limited threats to the dealer's justifi-

able expectations of privacy," *id.* at 316, 92 S.Ct. at 1596, since firearms business is justifiably highly regulated, dealer must have been aware of inspections when he entered the business, and government kept him up to date on authority for and nature of the inspections).

32. Airport searches have been the subject of numerous decisions. *See, e. g.,* United States v. Ruiz-Estrella, 481 F.2d 723 (2d Cir. 1973); United States v. Clark, 475 F.2d 240 (2d Cir. 1973); United States v. Slocum, 464 F.2d 1180 (3d Cir. 1972); United States v. Bell, 464 F.2d 667 (2d Cir. 1972); United States v. Epperson, 454 F.2d 769 (4th Cir. 1972); United States v. Kroll, 351 F.Supp. 148 (W.D. Mo.1972); United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972); United States v. Allen, 349 F.Supp. 749 (N.D.Cal.1972); United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971); *cf.* United States v. Moreno, 475 F.2d 44 (5th Cir. 1973); United States v. Lindsey, 451 F.2d 701 (3d Cir. 1971). Most of these decisions have relied upon *Terry's* stop-and-frisk rationale or general "reasonableness" to uphold searches (including magnetometer scanning) of either the prospective passenger's person, *e. g.,* Moreno, 475 F.2d at 49–52; Bell,

Those cases deal with a wholly different problem; and, in doing so, (1) they impose a requirement for justification of individual searches that pre-boarding screening searches cannot meet, and (2) they permit searches which are in some respects more extreme, and in other respects less so, than required to meet the need relied upon to justify pre-boarding screening searches.[33]

*Terry* dealt with a street confrontation between a citizen and a policeman. The Court held that when a policeman is entitled to forcibly "stop" a person to inquire about possible criminal activity,[34] and has reason to believe that the person is armed and dangerous, he may conduct a limited pat-down search for weapons to protect himself while conducting the inquiry. In *Terry*, in *Sibron*, and later in *Adams*, the Court went to great pains to make clear that the officer's right to conduct such a search of an individual depends upon the officer's possession of specific, articulable facts sufficient to satisfy a reasonably prudent person that the particular individual is in fact armed and dangerous. To justify a stop-and-frisk, the government must focus on each person and demonstrate that as to that individual there is specific cause to fear the justifying harm.[35]

The Court also emphasized that the justification for a *Terry* "frisk" was primarily the officer's self-protection,[36]

464 F.2d at 672–674 (Mulligan, J.); *id.* at 674–675 (Friendly, J., concurring); Epperson, 454 F.2d at 770–772; Lindsey, 451 F.2d at 703–704; Lopez, 328 F.Supp. at 1093–1098; *cf.* Slocum, 464 F.2d at 1182–1183, or his carry-on luggage, *e. g.*, Slocum, 464 F.2d at 1182–1183; Kroll, 351 F.Supp. at 154–155; *but see* Ruiz-Estrella, 481 F.2d at 727 (either "consent," knowledge of a right to avoid the search by not boarding, or "compelling circumstances" is required); Clark, 475 F.2d at 247 (same); *Allen*, 349 F.Supp. at 752–753 (either "probable cause" or "consent" required for luggage search).

Most of these decisions involved one or more aspects of the 1968 federal task force's anti-hijacking "system." *But see Moreno* and *Lindsey*. As we have noted, this system did not demand a physical search of all passengers or their carry-on luggage. Instead, prospective passengers were subjected to a series of "screening" techniques, including the use of the behavioral "profile" and the magnetometer. Only when a passenger was designated a "selectee" by these consecutive "screening" techniques was he required to submit his carry-on luggage, or his person, to a more intrusive search. In the present case, however, as under the currently mandated procedure, every passenger (except appellant) was subjected to a magnetometer scan and every carry-on item was subjected to an actual search.

33. *See, e. g.*, McGinley & Downs, Airport Searches and Seizures—A Reasonable Approach, 41 Ford.L.Rev. 293, 313–316 (1972); Note, Skyjacking: Constitutional Problems Raised by Anti-Hijacking Systems, 63 J.Cr.L., Criminology, & Police Science 356, 360–363 (1972); Note, Airport Security Searches and the Fourth Amendment, 71 Colum.L.Rev. 1037, 1055–1056 (1971); *but see* Abramovski, The Constitutionality of the Anti-Hijacking Security System, 22 Buff. L.Rev. 123, 134–140 (1972).

34. *Terry* did not address the issue of the policeman's right to "stop" a suspect in the first instance, *see* 392 U.S. at 19 n. 16, 88 S.Ct. 1868; *id.* at 32–33, 88 S.Ct. 1868 (Harlan, J., concurring), but the question was resolved in Adams v. Williams, 407 U.S. at 146, 92 S.Ct. 1921, 32 L.Ed.2d 612, quoted *infra*. *See* Note, The Supreme Court, 1971 Term, 86 Harv. L.Rev. 1, 172, 173–176 (1972).

35. Thus, in *Terry*, the Court said: "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 20–21, 88 S.Ct. at 1879–1880.

The Court was even more explicit in *Sibron*, 392 U.S. at 64, 88 S.Ct. at 1903: "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."

36. "The sole justification of the search . . . [under *Terry*] is the protection

and that all searches must be "reasonably related in scope to the justification for their initiation," *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884. Consequently, the Court held, the permissible scope of a *Terry* "frisk" is limited to a patting down of the "stopped" person's outer clothing, for no more is required to detect the presence of weapons that might be available for immediate use against the officer.[37]

■ The search of appellant, however, occurred as part of a screening process directed not against appellant or any other person as such, but rather against the general introduction of weapons or explosives into a restricted area. The search was indiscriminate, and, in view of its object, necessarily so, absent a foolproof means of isolating in advance those few individuals who were genuine hijack risks. Moreover, it required an intrusion sufficient in scope to detect not only weapons that were immediately accessible to appellant when he was stopped prior to boarding, but also any weapons that would be accessible to him *after* boarding.

*Terry, Sibron,* and *Adams* are inapposite because Mr. Read had no particular interest in appellant as an individual. He had no individualized basis for the search at all, much less specific and articulable facts that would justify a reasonably prudent man in believing that appellant was about to commit a crime or that he was carrying a weapon.

Moreover, the search exceeded the scope necessary to assure Mr. Read that appellant did not have a weapon immediately available for use against him. Some rationale other than that of *Terry* is required to justify extension of the "frisk" to appellant's briefcase.[38]

■ Extension of the *Terry* stop-and-frisk rationale to authorize airport screening searches would result in intrusions upon privacy unwarranted by the need. As the Court made explicit in *Adams, Terry* applies when "the officer is entitled to make a forcible stop." 407 U.S. at 146, 92 S.Ct. at 1923. In this situation, *Terry* permits a forcible search: the officer could hardly be required to secure a legitimately detained person's permission to conduct a reasonable, self-protective search. As will be discussed below, however, neither forcible detention nor forcible search is justified by the legitimate governmental interest served by airport screening searches.

If *Terry's* authorization of a stop-and-frisk is separated from the requirement that there be specific articulable facts establishing reasonable cause to believe that the individual stopped and searched is committing or about to commit an offense and is armed and dangerous, there is no readily apparent limitation on the policeman's power short of a concession that governmental agents may detain and search anyone, anywhere, whenever there is a serious threat of crime. There is no reason to believe that the incidence of concealed weapons is greater among airline passengers than among members of the

---

of the police officer and others nearby. . . ." 392 U.S. at 29, 88 S.Ct. at 1884. *See also id.* at 24, 26, 27, 30, 88 S.Ct. at 1868. The *Terry* search is a "self-protective search for weapons." *Sibron,* 392 U.S. at 64, 88 S.Ct. at 1903.

37. "[The frisk] must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. . . ." *Terry,* 392 U.S. at 26, 88 S.Ct. at 1882. The officer is entitled only "to conduct a carefully limited search of the outer clothing of . . . [legitimately "stopped" persons] in an attempt to discover weapons which might be used to

assault him." *Id.* at 30, 88 S.Ct. at 1885.

In *Sibron,* the officer "thrust his hand into Sibron's pocket and took from him envelopes of heroin." 392 U.S. at 65, 88 S.Ct. at 1904. This evidence was suppressed, for "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.*

38. *Cf. Terry,* 392 U.S. at 32, 88 S.Ct. 1868, 20 L.Ed.2d 889 (Harlan, J., concurring).

public generally,[39] and *Terry* does not justify the wholesale "frisking" of the general public in order to locate weapons and prevent future crimes.

### III

The appropriate standards for evaluating the airport search program under the Fourth Amendment are found in a series of Supreme Court cases relating to "administrative" searches and in two Court of Appeals decisions applying these precedents.[40]

The essence of these decisions is that searches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched.

As we have seen, screening searches of airline passengers are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings. The essential purpose of the scheme is not to detect weapons or explosives or to apprehend those who carry them, but to deter persons carrying such material from seeking to board at all.[41]

Of course, routine airport screening searches will lead to discovery of contraband and apprehension of law violators. This practical consequence does not alter the essentially administrative nature of the screening process, however, or render the searches unconstitutional. One purpose of the searches authorized in United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d

---

39. In one sample of 500,000 passengers, only 20 were denied boarding for any reason. *See* Note, Skyjacking: Constitutional Problems Raised by Anti-Hijacking Systems, 63 J.Cr.L., Criminology, & Police Science 356, 356 n. 2 (1972).

40. .United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); United States v. Schafer, 461 F.2d 856 (9th Cir. 1972); Downing v. Kunzig, 454 F.2d 1230 (6th Cir. 1972); *see* Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959); *see also* Biehunik v. Felicetta, 441 F.2d 228 (2d Cir. 1971).

*Biswell* upheld a search of a licensed firearms dealer's storeroom as part of inspection procedures authorized by § 923 (g) of the Gun Control Act of 1968.

*Wyman* upheld conditioning receipt of future welfare benefits on the recipient's consent to periodic home visits by caseworkers as part of established routine in the administration of New York welfare statutes and regulations.

*Camara* upheld entry into leased premises as part of a routine annual inspection by city housing inspectors to determine compliance with San Francisco's housing code.

*See* upheld entry into a commercial warehouse as part of a routine periodic city-wide canvass to obtain compliance with Seattle's fire code.

*Schafer* upheld the search of an air traveler's luggage as part of a screening inspection of all baggage and personal effects of aircraft passengers leaving Hawaii to prevent exportation of plant pests and diseases.

*Downing* upheld the search of a briefcase for weapons and explosives pursuant to a rule conditioning entry into a federal building upon submission to such a search.

41. United States v. Lopez, 328 F.Supp. 1077, 1082–1083 (E.D.N.Y.1971); McGinley & Downs, *supra* note 33, at 304.

In reporting a proposed bill that essentially would have codified those aspects of the screening program that are relevant here, the Senate Committee on Commerce said: "The only purpose for which the general search or inspection of persons and their property shall be undertaken is to insure that dangerous weapons will not be unlawfully carried in air transportation or in intrastate air commerce." S.Rep. No. 93–13, 93d Cong., 1st Sess., at 10 (1973).

87 (1972); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), was to discover continuing violations of regulatory codes.[42]

There is an obvious danger, nonetheless, that the screening of passengers and their carry-on luggage for weapons and explosives will be subverted into a general search for evidence of crime.[43] If this occurs, the courts will exclude the evidence obtained.[44] Appellant does not argue that airport searches are currently being used as a subterfuge for the prohibited "general search."

42. As Justice White pointed out in *Camara*, "inspections of the kind . . . [involved in *Frank, Camara*, and *See*] do in fact jeopardize 'self-protection' interests of the property owner. Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces only an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second inspection. . . . Finally, as this case demonstrates, refusal to permit an inspection is itself a crime, punishable by fine or even by jail sentence." 387 U.S. at 531, 87 S.Ct. at 1732 (citations omitted).

43. The record is not entirely comforting in this respect. Less than 20% of the arrests stemming from the anti-hijacking system have been for offenses related to aircraft security. *See* N.Y. Times, Nov. 26, 1972, at p. 1, col. 2. Over 33% of the arrests have been for possessory drug offenses, and the remainder for such miscellaneous charges as parole violation and illegal entry into the United States.

A report of the Commerce Committee of the U.S. Senate states, "it has been reported that certain classes of individuals, such as young people and oddly attired individuals have been harassed and intimidated by general frisks or shakedowns without any prior indication or probable cause that such persons were unlawfully carrying weapons. We find this a deplorable practice, abhorrent to individual freedom and the Bill of Rights of the U.S. Constitution." *See* S.Rep. No. 93–13, 93d Cong., 1st Sess., at 9 (1973).

General Benjamin O. Davis, Ass't Secretary of Transportation, has also expressed some concern: "I think it's true that some people have been doing some searching for narcotics violations. And I think there is a danger in this from a civil rights standpoint that has me worried." N.Y. Times, Nov. 26, 1972, at p. 1, col. 1.

*See also* J. Arey, The Sky Pirates 242 (1972) (quoting Frank Cardman, Director of Security for Pan American World Airways): "We've shaken down people—just by virtue of experience, say sky marshal or customs experience—we've shaken down any number of people that we've found thoroughly undesirable to have aboard an airplane, but are not basically hijackers. Narcotics!—we're knocking off people day after day carrying the hard stuff."

And see the following testimony by FAA Administrator Schaffer:

"We have law enforcement information now available. In other words, we are going to scrub down the manifest. People buy tickets on airlines and make reservations; once their name appears, we then start the process. Is this man evading the law? Is he a known international operator? Has he any record at all? And it is possible we will even find out about their medical record, meaning, have they a record of being in mental institutions, and so on, because a great many of our hijackings have involved mentally deranged people taking this as a way of getting recognition or a way of calling attention to themselves, or for whatever other purposes.

So, if we have all of this information being brought to bear, gathered from all the sources available to us, intelligence sources, law enforcement sources, airline security, local police, all of this, there is a good chance that we will really have an antiseptic passenger list, in time."

Aircraft Hijacking Hearings at 102.

44. *See, e. g.*, Abel v. United States, 362 U.S. 217, 229–230, 240, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Montana v. Tomich, 332 F.2d 987, 989 (9th Cir. 1964); Taglavore v. United States, 291 F.2d 262, 265–266 (9th Cir. 1961).

It has been suggested that in order to avoid the danger of abuse, any evidence unrelated to the legitimate purpose of the regulatory search should be excluded. *See* Note, Skyjacking: Constitutional Problems Raised by Anti-Hijacking

To pass constitutional muster, an administrative search must meet the Fourth Amendment's standard of reasonableness. "Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Camara v. Municipal Court, *supra,* 387 U.S. at 536–537, 87 S.Ct. at 1735.

The need to prevent airline hijacking is unquestionably grave and urgent.[45] The potential damage to person and property from such acts is enormous. The disruption of air traffic is severe. There is serious risk of complications in our foreign relations.[46]

A pre-boarding screening of all passengers and carry-on articles sufficient in scope to detect the presence of weapons or explosives is reasonably necessary to meet the need. Little can be done to balk the malefactor after such material is successfully smuggled aboard, and as yet there is no foolproof method of confining the search to the few who are potential hijackers.

It is not fatal that the search of appellant's briefcase was conducted without a warrant. Under the indiscriminate screening procedures required by current regulations and applied in this case, the decision to search the carry-on luggage of a particular passenger is not "subject to the discretion of the official in the field," Camara, *supra,* 387 U.S. at 532, 87 S.Ct. at 1733; and the practical effect of a warrant requirement would be to "frustrate the governmental purpose behind the search." *Id.* at 533, 87 S.Ct. at 1733.[47]

In this and other relevant respects,[48] the airport search program is indistinguishable, for Fourth Amendment purposes, from the warrantless screening inspection of air passengers and their luggage for plant pests and disease approved in United States v. Schafer, 461 F.2d 856 (9th Cir. 1972).

One important caveat should be stressed, however. To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it.[49] It follows that airport screening searches are valid only if they recognize the right of a person to

---

Systems, *supra* note 33, at 365; *see also* McGinley & Downs, *supra,* note 33, at 323, n. 198; *quoting* Note, The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 186 (1968). Although we impliedly rejected this suggestion as applied to the facts of United States v. Schafer, 461 F.2d 856 (9th Cir. 1972), the Supreme Court expressly reserved the question in Wyman v. James, 400 U.S. 309, 323, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). However, the evidence uncovered in the search of appellant's briefcase could hardly be called unrelated to the justification for the search.

45. *See* United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972); United States v. Bell, 464 F.2d 667, 669 (2d Cir. 1972); United States v. Epperson, 454 F.2d 769, 771 (4th Cir. 1972).

46. *See, e. g.,* Note, Skyjacking: Constitutional Problems Raised by Anti-Hijacking Systems, *supra* note 33, at 359.

47. *See* United States v. Biswell, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); United States v. Schafer, 461 F.2d 856, 858 (9th Cir. 1972); Downing v. Kunzig, 454 F.2d 1230, 1232–1233 (6th Cir. 1972).

48. As we have seen, the program rests upon an adequate statutory and regulatory base. *See* notes 7, 20–25, and related text; *but see* note 26.

49. "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). *See, e. g.,* Sibron v. New York, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed. 2d 917 (1968); Chimel v. California, 395 U.S. 752, 762–764, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This is especially true where, as in this instance, the search, impinges not only upon Fourth Amendment rights but upon other constitutional rights as well. *See* Part IV of this opinion.

avoid search by electing not to board the aircraft.[50]

It is difficult to see how the need to prevent weapons and explosives from being carried aboard the plane could justify the search of a person who had elected not to board. Perhaps it could be argued that a compelled search might lead to the apprehension of a potential hijacker, eliminating or at least reducing the chance that he would try again. Compared to the degree of additional intrusiveness that compulsory searches involve, however, this possibility seems so slight as to be inconsequential. The risk of successful hijacking is not enhanced by allowing a potential passenger to avoid a search on a particular occasion by electing not to fly. Airport screening searches, as carried out in this case and as currently employed nationwide, are not selective. A prospective passenger who elects not to fly on an earlier flight is, like all other passengers, certain to be subjected to a search before he can board a later flight.

It is significant that the regulations establishing the airport search program do not authorize or require compelled searches.[51]

Since a compelled search of persons who elect not to board would not contribute to barring weapons and explosives from the plane, it could serve only the purpose of apprehending violators of either the criminal prohibition against attempting to board an aircraft while carrying a concealed weapon, 49 U.S.C. § 1472(*l*), or some other criminal statute. Such searches would be criminal

---

50. *See* United States v. Meulener, 351 F. Supp. 1284, 1288–1291 (C.D.Cal.1972); United States v. Allen, 349 F.Supp. 749, 752 (N.D.Cal.1972); cf. United States v. Bell, 464 F.2d 667, 674 (Friendly, J., concurring) (imposing requirement that passengers have "advance notice" of liability to search).

Assistant Attorney General Will R. Wilson testified before the House Committee on Interstate and Foreign Commerce as follows: "My feeling is that a general surveillance of the public in the way of a search or otherwise, in getting on a plane, must be done administratively some way and probably the nearest way that that can be made constitutional is through a consent procedure in the buying of a ticket or something like that." Hearings on Aviation Safety and Aircraft Piracy Before the H. Comm. on Interstate and Foreign Commerce, 91st Cong., 1st Sess., at 82 (Feb. 5, 1970).

51. The FAA directive is explicit: the right to board is conditioned upon submission to a "consent" search. *See* note 24, *supra*, and related text.

No more is permitted by statute. 49 U.S.C. § 1511 authorized air carriers "to *refuse* transportation to a passenger or to *refuse* to transport property" if the transportation would be "inimical to safety of flight" (emphasis added). And see Hearings on Aviation Safety and Aircraft Piracy Before the H. Comm. on Interstate and Foreign Commerce, 91st Cong. 1st Sess., at 106 (1970) (testimony of Acting FAA Administrator David D. Thomas).

The proposed Air Transportation Security Act of 1973, basically a codification of the relevant aspects of the present airport screening search program, also stresses that such searches are "consent" searches. *See* S.Rep. No. 93–13, 93d Cong., 1st Sess., at 9 (1973) (discussing § 316(a)(1) of the proposed Act): even after a passenger activates the magnetometer, he is subject to a search or frisk "only if he first voluntarily consents. If such consent is denied then the individual shall forfeit his opportunity on that occasion to be transported and the air carrier shall deny his passage."

In a statement before the Subcommittee on Aviation of the Senate Commerce Committee on January 10, 1973, Secretary Volpe "identif[ied] the features which our program has in common with S. 39," the above proposed Act, as follows:

"Specifically, the regulations recently issued by FAA follow S. 39 by requiring the screening of passengers by weapon-detectors. Additionally, the FAA regulations direct the air carriers to deny boarding to any person who is not cleared by a detection device, or if such equipment is not available, *does not consent* to the search of his person for a weapon and to refuse to permit any person to carry aboard any property which he *does not consent* to have inspected" (emphasis added).

*See also* testimony of Will R. Wilson, *supra* note 50.

investigations subject to the warrant and probable cause requirements of the Fourth Amendment.[52]

In sum, airport screening searches of the persons and immediate possessions of potential passengers for weapons and explosives are reasonable under the Fourth Amendment provided each prospective boarder retains the right to leave rather than submit to the search.

### IV

This conclusion is consistent with a full recognition of appellant's constitutional right to travel.[53]

█ Although the right to travel is not absolute,[54] and its scope and limitations remain uncertain,[55] it is firmly settled that freedom to travel at home and abroad without unreasonable governmental restriction is a fundamental constitutional right of every American citizen. "This Court long ago recognized that the nature of our Federal Union and our constitutional concepts, of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." Shapiro v. Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969).[56]

█ At the minimum, governmental restrictions upon freedom to. travel are to be weighed against the necessity advanced to justify them, and a restriction that burdens the right to travel "too broadly and indiscriminately" cannot be sustained. Aptheker v. Secretary of State, 378 U.S. 500, 505, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). " '[E]ven though the governmental purpose be legitimate and substantial, that purpose

---

52. In sustaining warrantless "home visitations" in Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), Justice Blackmun stressed the fact that the "visitations" were not compelled. *See* 400 U.S. at 325, 91 S.Ct. 381. Instead, the welfare recipients retained the option of avoiding the home "visit" by giving up welfare payments. *See id.* at 317–318, 324, 325, 91 S.Ct. 381. Similarly, prospective passengers must retain the option of avoiding the warrantless preboarding searches by giving up their right to board the aircraft.

United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), allowing compulsory warrantless regulatory searches, is distinguishable. Unlike *Wyman* and the instant case, the element of compulsion was essential to the fulfillment of the justifying governmental purpose. Moreover *Biswell* involved the conditioning of the issuance of a business license on the government's right to inspect the business premises, an area in which the government has traditionally had great powers. *See* Note, The Law of Administrative Inspection: Are Camara and See Still Alive and Well?, 1972 Wash.U.L.Q. 313, 327–330.

53. For general discussions of airport searches in relation to the passengers' constitutionally protected right to travel, *see* Note, Skyjacking: Constitutional Problems Raised by Anti-Hijacking

Systems, *supra* note 33, at 363–364; Abramovsky, *supra* note 33, at 127–130.

54. *See, e. g.,* Zemel v. Rusk, 381 U.S. 1, 14, 15–16, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Edwards v. California, 314 U.S. 160, 184, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (Jackson, J., concurring); B. Schwartz, Rights of the Person 769–70, 774 (1968).

55. This is due in part, perhaps, to the fact that the constitutional source of the right is not yet settled. See B. Schwartz, *supra,* note 55, at 766–769; Kurland, The Privileges & Immunities Clause: "Its Hour Come Round at Last"?, 1972 Wash.U.L.Q. 405, 415–418; Abramovsky, *supra,* note 33, at 127–128; Note, The Right to Travel—Its Protection and Application under the Constitution, 40 U. Mo.K.C.L.Rev. 66, 67–77 (1971).

56. *See, e. g.,* San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Dunn v. Blumstein, 405 U.S. 330, 338, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Oregon v. Mitchell, 400 U.S. 112, 237, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Brennan, White, & Marshall, JJ., concurring in part and dissenting in part); United States v. Guest, 383 U.S. 745, 757–758, 86 S.Ct. 1170, 16 L.Ed. 2d 239 (1966); Zemel v. Rusk, 381 U.S. 1, 14, 15, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1964); Kent v. Dulles, 357 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1961), quoted in Aptheker v. Secretary of State, *supra,* 378 U.S. at 508, 84 S.Ct. 1659.[57] Moreover, exercise of the constitutional right to travel may not be conditioned upon the relinquishment of another constitutional right (here, the Fourth Amendment right to be free of unreasonable search), absent a compelling state interest.[58]

These doctrines dictate a critical examination of each element of the airport security program to make certain that neither the passenger's right to travel nor his right to personal privacy is burdened beyond the clear necessities of current circumstances.

█ As we have seen, however, the need for some limitations upon these rights is clear. In light of that need, a screening of passengers and of the articles that will be accessible to them in flight does not exceed constitutional limitations provided that the screening process is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives, that it is confined in good faith to that purpose, and that potential passengers may avoid the search by electing not to fly.[59]

## V

The magistrate and the district court, as we have said, found that appellant "consented" to the inspection of his briefcase, and that the search was therefore lawful.

We agree that in this case the issue may be dealt with as one of "consent."

█ We have held that, as a matter of constitutional law, a prospective passenger has a choice: he may submit to a search of his person and immediate possessions as a condition to boarding; or he may turn around and leave. If he chooses to proceed, that choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search, is essentially a "consent," granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment.

█ The Supreme Court recently re-examined the nature of "consent" in the Fourth Amendment context in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Court was concerned with whether a consent, concededly given, was given "voluntarily." As stated by the Court, "The precise question in this case . . . is what must the state prove to demonstrate that a consent was 'voluntarily' given." 412 U.S. at 223, 93 S.Ct. at 2045. The Court concluded that "the

57. It has been argued that restrictions upon the right to travel between states, as distinguished from the right to travel internationally, can be justified only by a clear showing that they are necessary to promote a compelling governmental interest. Shapiro v. Thompson, 394 U.S. 618, 642–644, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (Stewart, J., concurring). *See also* Dunn v. Blumstein, 405 U.S. 330, 335, 338–339, 342, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) ; Oregon v. Mitchell, 400 U.S. 112, 238, 91 S.Ct. 260, 27 L.Ed. 2d 272 (1970) (opinion of Brennan, White, & Marshall, JJ.) ; Shapiro v. Thompson, *supra,* 394 U.S. at 634, 89 S.Ct. 1322.

58. See Dunn v. Blumstein, 405 U.S. 330, 342, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) ; Oregon v. Mitchell, 400 U.S. 112, 238,

91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (opinion of Brennan, White, & Marshall, JJ.) ; Note, Airport Security Searches and the Fourth Amendment, 71 Colum. L.Rev. 1039, 1049 (1971) ; *See* also Aptheker v. Secretary of State, 378 U.S. 500, 507–508, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

59. The airport search program is not an absolute bar to travel. Other means of transportation are available. Moreover, for the vast majority such a search entails at most a slight delay; it does not bar their intended flight. In a broad sense, the airport search program is a governmental effort to protect freedom to travel from private interference, rather than to impede the individual's right to travel.

question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of effective consent." *Id.* at 227, 93 S.Ct. at 2047–2048. The *Bustamonte* test would be applicable in determining whether consent to a pre-boarding search was "voluntarily" given. *See* United States v. Ruiz-Estrella, 481 F.2d 723, 730 (2d Cir. 1973).

There is, however, a threshold question, not presented in *Bustamonte*. That question is whether in fact consent has been given. Only after some form of consent-in-fact is shown can "the precise question" of the "voluntariness" of that consent arise.

It may well be that under the present airport screening program, operating pursuant to current regulations, the alternatives presented to a potential passenger approaching the screening area are so self-evident that his election to attempt to board necessarily manifests acquiescence in the initiation of the screening process.

 It is not so clear, however, that this was true when appellant sought to board TWA's Flight 743 on March 16, 1971. The nature and scope of airport searches were not then widely known. The regulations mandating pre-boarding searches of passengers on all flights had not yet been issued. *See* text at note 27. The flights affected and the procedures employed varied with different carriers; the record discloses that passengers seeking to board TWA Flight 743 were searched only because this was a "Red Alert" flight—one having no more than a single domestic stop before departing for a foreign destination.

 It may be that signs, pre-boarding announcements, screening operations underway at nearby boarding gates, or other circumstances justified an inference that appellant was alerted to the procedures being employed and, by his attempt to board, manifested his willingness to submit to the search of his briefcase. No such evidence was offered, however. The hearing focused instead upon the instant Mr. Read reached for appellant's briefcase and appellant relinquished it; and the posture of the evidence was simply that appellant's briefcase "was taken from his hand, opened before he had a chance to really do or think anything." *See* note 1.

This record would not support an inference that appellant had decided to accede to the search—any more than if it appeared that appellant had set his briefcase down and turned away for a moment, and Mr. Read had opened it without his knowledge.

 The magistrate apparently recognized the absence of either direct or circumstantial proof of consent-in-fact. He held, however, that because appellant arrived late, the burden of proof was not on the government to show "consent," but on appellant to show the lack of it: "I think there are certain hazards that go along with arriving late, and I must find in such a situation an implied consent . . . ." The district court presumably agreed.

This was error. It is settled, of course, that the government bears the burden of proving "consent." *See* Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Montana v. Tomich, 332 F.2d 987, 989 (9th Cir. 1964); *see also* Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921). The government and TWA could insist upon a pre-boarding search; they could deny appellant the right to fly if he refused to consent, or if his late arrival deprived them of sufficient time to obtain his consent or to conduct the search. But the government may not justify a search on the basis of "consent" unless it first establishes that such consent was given, expressly or by implication.

It may well be, as we have said, that proof is available that would justify an inference that appellant's attempt to board manifested a consent to the search. This evidence may not have been offered because of the magistrate's misconception as to who, in the circumstances, bore the burden of proof. A remand for further consideration of the consent issue is therefore appropriate.

Reversed and remanded.