**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Guadalupe SOTO–CAMACHO,
Defendant–Appellant.**

No. 94–50572.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1995.

Decided June 9, 1995.

Rebecca P. Jones, Federal Defenders of San Diego, Inc., San Diego, CA, for defendant-appellant.

Patrick K. O'Toole (argued and on the brief), Timothy D. Coughlin (on the brief), Asst. U.S. Attys., San Diego, CA, for plaintiff-appellee.

Before: CUMMINGS *, SCHROEDER, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

This appeal requires us to decide the constitutionality of a stop and detention at a temporary immigration checkpoint that is open for up to 10 days each month and is put into operation in part based on intelligence about the movement of drugs across the border.

Guadalupe Soto–Camacho was stopped at the Jacumba Checkpoint, two miles north of the United States–Mexican border on the westbound lane of Interstate 8 near Jacumba, California. He was referred to the secondary inspection site because he couldn't answer questions about his citizenship and traffic was backing up. Soto consented to a search of the trunk. As Border Patrol agents thought that he was trying to divert

* Honorable Walter J. Cummings, United States Circuit Judge for the Seventh Circuit, sitting by designation.

attention away from the front, they continued the consensual search inside the vehicle and under the hood. They found no illegal aliens, but did find 35 kilograms of cocaine.

Soto appeals his conviction following a conditional guilty plea to being an accessory after the fact to possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 3. He challenges the district court's denial of his motion to suppress, which he argues should have been granted because the entire temporary checkpoint at Jacumba is unconstitutional because the government bases its decision on when to operate the checkpoint on drug intelligence. He also contends that the immigration stop was pretextual, and that both the stop and his referral to secondary inspection were without reasonable suspicion, all in violation of his Fourth Amendment rights.

We hold that no unreasonable search or seizure occurred, and affirm.

## I

The United States Border Patrol operates a temporary checkpoint on the westbound lane of Interstate 8, the main highway between San Diego and El Centro, California. Information about the checkpoint begins a mile away, with large signs, traffic cones, and flashing lights. At the checkpoint, a uniformed Border Patrol agent stops all vehicles and asks a few questions, sometimes including a request for documents showing the right to be in the United States. Border Patrol agents are cross-designated as drug enforcement and customs agents, and are trained to detect drug smuggling as well as alien smuggling.

The Jacumba Checkpoint is open approximately once a month, for up to ten days. It is placed into operation after the Patrol Agent in Charge of the El Centro Border Patrol Station decides that the checkpoint should be set up and receives permission to do so from the Chief Patrol Agent of the El Centro Border Patrol Sector. Various factors are considered, including historical data reflecting trends of alien entries and narcotics smuggling, and intelligence indicators regarding the movement and flow of aliens and contraband into the United States.[1] Agents who work at the checkpoint are not involved in the decision to activate the checkpoint.

Between January 21, 1992 and April 24, 1994, Border Patrol agents at the Jacumba Checkpoint made at least 322 separate illegal alien seizures and apprehended 1,544 illegal aliens. During the same period, there were 68 seizures of controlled substances discover-

---

1. The government offered the affidavit of the Acting Patrol Agent in Charge of the El Centro Station who, subject to the approval of the Chief Patrol Agent of the El Centro Border Patrol Sector, makes the decision on when to place the Jacumba Checkpoint into operations. The affidavit further explained:

The Patrol Agent in Charge takes various factors into consideration in arriving at the decision as to when the Jacumba Checkpoint will be operational, and such factors may include, not necessarily in order of precedence, the following:

a. El Centro historical data reflecting trends of alien entries, alien smuggling, narcotics smuggling, and an evaluation of the peak periods of these trends;

b. The ability to coordinate the Jacumba Checkpoint operation with activities of U.S. Border Patrol Sectors which adjoin the El Centro Sector to enhance highway coverage along the border area to deter and interdict illegal aliens;

c. The ability to complement the operation of El Centro Station's two other Border Patrol checkpoints;

d. Intelligence indicators regarding: lunar cycles, harvest seasons of legitimate and illegitimate crops from which border contraband results, environmental, political and social factors that may be occurring in Mexico and other countries that might affect the movement and flow of aliens and contraband into the United States;

e. The fact that a large percentage of checkpoint narcotic seizures involve alien principals (during the period from January 21, 1992 through April 24, 1994, 76% of the narcotic seizures at the Jacumba Checkpoint involved alien principals);

f. The fact that Interstate 8 roughly parallels the United States/Mexico border from Yuma, Arizona to San Diego, California and the checkpoint is situated within one and a half miles of the United States/Mexico border in the westbound lanes of traffic, and as such Interstate 8 is utilized as a means to access other routes to circumvent the other Border Patrol Checkpoints operating in Southern California[.]

ed in vehicles and 87 persons were arrested as a result.

Soto was stopped at the checkpoint about 10:30 a.m., driving his Ford Escort station wagon. He was asked routine questions about his citizenship, which he failed to answer, and tried to hand his whole wallet to the agent. Because of this, and the fact that traffic was backing up, Soto was referred to secondary inspection. There, Soto's status was verified. After that, an agent asked Soto if he could look in the rear end of the vehicle; Soto got out, opened the rear door, and consented. No more than a few minutes had elapsed. The agent could see that there were no aliens in the rear of the vehicle, but wanted to look further as an alien could have been hidden in the rear spare tire compartment under the rear floor. Soto does not dispute that he consented. While searching inside the wagon, the agent saw material blocking the air vents, looked under the hood, and saw narcotics packaging. Soto was then arrested.

After an evidentiary hearing, the district court found that the checkpoint was properly set up and operated and that the stop of this defendant was proper.

## II

■ Soto's appeal turns on whether it is permissible for the decision as to when a validly established temporary immigration checkpoint will be operated to be based even in part on drug intelligence. We have already held in *United States v. Hernandez*, 739 F.2d 484 (9th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 441, 83 L.Ed.2d 366 (1984), that a stop conducted at a clearly visible temporary checkpoint pursuant to a routine inspection of all vehicles for illegal aliens is not unreasonable under the Fourth Amendment.[2] Except for the potential influence of drug intelligence on the decision of when within the month to activate it, the Jacumba Checkpoint does not differ in any material

respect from the temporary checkpoint at Camp Pendleton that we condoned in *Hernandez*.[3] Its primary purpose is to check for aliens, all vehicles are stopped, the checkpoint is well identified, Border Patrol agents exercise no discretion over the checkpoint's operation, and the stop itself involves a minimal intrusion.

Soto analogizes an immigration checkpoint to an administrative search, arguing that because a search into general criminal activity oversteps the bounds of an administrative search, the bounds of an immigration stop are likewise exceeded when the checkpoint blossoms into a full-blown tool in the war on drugs. From this, he submits, it follows that an otherwise valid stop is invalidated from the beginning when one of the reasons that the checkpoint is operating is to look for drugs. Thus, Soto contends, he was illegally seized at the moment he was stopped by the primary inspector, requiring suppression of the evidence as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Soto relies on *United States v. Santa Maria*, 15 F.3d 879 (9th Cir.1994), where we held that 8 U.S.C. § 1357(a)(3), which authorizes entry onto property to search for aliens, does not justify a Border Patrol search of a trailer on the property for drugs in the absence of probable cause. However, we distinguished entry onto the land, which had a dual drug and immigration purpose, from search of the trailer, which was intended only to search for drugs. There is no evidence here to suggest that the Jacumba Checkpoint was operated solely for the purpose of drug interdiction, or that Soto himself was stopped, referred to secondary, or asked for permission to search his vehicle solely to look for drugs.

Soto also relies on Judge Kozinski's dissenting opinion in *United States v. Soyland*, 3 F.3d 1312, 1315–19 (9th Cir.1993), *cert. dismissed*, —— U.S. ——, 115 S.Ct. 32, 129

---

**2.** Although the constitutionality of a dual immigration and drug purpose was not at issue in *Hernandez*, the purpose of the Camp Pendleton temporary checkpoint system was, among other things, "to locate and confiscate unlawful weapons and other contraband, including illicit drugs,

and to reduce or eliminate the threat to the security of the Base caused by the presence of illegal aliens." *Hernandez*, 739 F.2d at 485.

**3.** We dismiss Soto's contention to the contrary in Part IV, *infra* at 412–413.

L.Ed.2d 928 (1994), to argue that once an agent conducting an administrative search starts looking for drugs, the search becomes improper. We have, however, held to the contrary in the similar context of Coast Guard inspections at sea. In *United States v. Watson*, 678 F.2d 765, 769 (9th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982), a Coast Guard general administrative plan called for the boarding and inspection of all United States vessels less than 200 feet in length within a particular area. The government conceded that one of the reasons the area was selected for implementation of the routine document and safety inspections was to interdict the flow of marijuana to the United States. Nevertheless, we concluded that the stop was proper because there was an independent administrative justification for it, and its scope did not exceed what was proper under that administrative purpose. Therefore, we declined to consider any possible criminal enforcement interest the Coast Guard may have had.

■ Likewise here, we cannot say that the stop was improper solely because general intelligence having to do with the movement of drugs was one of the reasons for the timing of the Border Patrol's decision to activate the checkpoint. As in *Watson*, the stop and search had an "independent administrative justification," and "did not exceed in scope what was permissible under that administrative justification." *Watson*, 678 F.2d at 771; *see United States v. Martinez–Fuerte*, 428 U.S. 543, 556–60, 96 S.Ct. 3074, 3082–84, 49 L.Ed.2d 1116 (1976); *Hernandez*, 739 F.2d at 486–87.

We therefore hold that the Jacumba Checkpoint stop itself was not infected, as Soto contends, by the fact that the Border Patrol bases the timing of its decision to set up the checkpoint in part on drug intelligence.

### III

Soto recasts the same point somewhat differently by urging that the referral in his case was pretextual. His first argument, that all stops at the Jacumba Checkpoint are pretextual by definition because the check-point was set up to seek drugs, fails for the reasons we have already explained. In any event, the district court's finding of propriety is not clearly erroneous in light of the statistics which show that illegal alien seizures are substantially greater than those related to drugs.

■ Soto then asserts that his own referral was also pretextual in that Border Patrol agents made virtually no effort to conduct an immigration inspection. This assertion, however, lacks support in the record; Soto failed to answer routine questions about his own citizenship at primary inspection. Again, the district court's findings of propriety are not clearly erroneous since the agents' testimony indicates that the immigration inspection was not finished at secondary once Soto's documentation had been examined and agents could see no one else in the wagon. Rather, the agents thought that an alien could have been hidden in the rear spare tire compartment. In any event, agents at both primary and secondary inspection testified that Soto's behavior was curious, and "[a] lack of certainty as to the reason for nervous behavior or the nature of suspected contraband does not amount to pretext." *United States v. Wilson*, 7 F.3d 828, 834 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2151, 128 L.Ed.2d 877 (1994) (approving referral to secondary at checkpoint as nonpretextual given agent's testimony that it was for an immigration purpose and the absence of evidence suggesting this was not the case); *see United States v. Preciado–Robles*, 964 F.2d 882 (9th Cir.1992) (approving search for narcotics after valid immigration papers produced); *United States v. Taylor*, 934 F.2d 218 (9th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992) (approving detention after immigration stop based on minimal articulable suspicion to seek drug related information through dog sniff).

### IV

■ Soto finally argues that the initial stop and referral in this case were illegal because the temporary checkpoint should require reasonable suspicion for an initial stop.

For this proposition he relies on *United States v. Maxwell*, 565 F.2d 596 (9th Cir. 1977), which involved a temporary checkpoint on a "lonely road" in the Imperial Valley that had only a small "stop ahead" sign 100–200 yards before a "sudden, unexpected, and somewhat traumatic" stop by an officer in a single car. Under those circumstances, we held that reasonable articulable suspicion was required. However, the Jacumba Checkpoint is on a major four-lane highway, is well advertised for almost a mile in advance, and is lighted and marked so that the motorist can see that other vehicles are being stopped and that Border Patrol agents are in charge. As with the permanent checkpoint at issue in *Martinez–Fuerte* and the temporary checkpoint approved in *Hernandez,* the interference at Jacumba is minimal and non-discretionary. Under these circumstances, the *Martinez–Fuerte* factors are satisfied as they were in *Hernandez.* *Hernandez,* not *Maxwell,* controls.

The district court therefore did not err in concluding that it was proper for the Border Patrol to make stops at this checkpoint, as it would at a permanent checkpoint, without any individualized suspicion.

AFFIRMED.