**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Sheri Lynn BULACAN, Defendant–
Appellee.**

No. 97–10222.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1998.

Decided Sept. 17, 1998.

As Amended Nov. 6, 1998.

Craig H. Nakamura, Assistant United States Attorney, Honolulu, Hawaii, for plaintiff-appellant.

Alexander Silvert, Federal Public Defenders, Honolulu, Hawaii, for defendant-appellee.

Before: NOONAN and THOMAS, Circuit Judges, PREGERSON,* District Judge.

---

* The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

PREGERSON, District Judge:

This case came before the district court on the criminal prosecution of Defendant–Appellee Sheri Lynn Bulacan ("Bulacan") for possession of methamphetamine with intent to distribute. The methamphetamine was seized during an administrative search of Bulacan that was conducted upon her entry into a federal building. Bulacan brought a motion to suppress, asserting that the evidence should be suppressed because the regulation authorizing the search was unconstitutional. The district court considered the constitutionality of the statute authorizing the search and agreed with Bulacan. The court therefore suppressed the evidence obtained in the search. Plaintiff–Appellant the United States (the "Government") maintains on appeal that the district court erred because an official's impermissible dual motive when conducting an otherwise valid administrative search does not invalidate the search. For the following reasons, we affirm the district court's decision.

## I. *Background*

This action involves administrative searches conducted under 41 C.F.R. § 101–20.301, which states in pertinent part:

> Packages, briefcases, and other containers in the immediate possession of visitors, employees, or other persons arriving on, working at, visiting, or departing from Federal property, are subject to inspection.

41 C.F.R. § 101–20.301 (1998).

Following the Oklahoma City bombing in April 1995, searches pursuant to this regulation were implemented in the Pearl City Social Security offices ("Federal Building"). At that time, the Federal Building went on yellow alert status. A yellow alert puts the Federal Building's security personnel ("Security Officers") on a heightened awareness of potential security threats against the government. Under a yellow alert, Security Officers search bags that are carried into the Federal Building. Because the Federal Building did not have a magnetometer or

metal detector, the Security Officers performed manual searches of hand-carried baggage, as well as physical searches, if they deemed it necessary.

The administrative searches at the Federal Building were not limited to searches for explosives and weapons. Security Officers were instructed to look for anything "dangerous" or for anything violating regulations. The regulations prohibited the possession or use of narcotics, alcohol, or gambling materials on federal property. *See* 41 C.F.R. §§ 101–20.306, 101–20.307 (1998). Therefore, Security Officers were also instructed to look for these items. The primary purpose behind the search was to look for weapons and explosives. The secondary purpose was to look for other materials that violated the regulations.

Security Officers were given wide discretion in how to conduct their searches. Because Security Officers were instructed that explosives could be as small as a quarter, virtually any closed container, however small, could be subject to a search. In deciding what containers to search, Security Officers were expected to rely on their individual training, expertise, and judgment; therefore, under a yellow alert, Security Officers had discretion to open a particular container if they felt there was a safety issue. Whether there is a safety issue is largely within the particular Security Officer's discretion.

On May 29, 1996, Defendant Sheri Bulacan went to the Federal Building to get an application for a replacement social security card. When she arrived, she was met at the security desk by Bruce Schaller ("Schaller"), a General Services Administration contract security officer. Bulacan was carrying a "fanny" pack ("pack"), and Schaller indicated that he needed to search it. Schaller maintains that Bulacan handed him the pack. Bulacan maintains that Schaller grabbed the pack off her shoulder.

Schaller proceeded to search Bulacan's pack. Schaller was primarily looking for weapons and explosives, but was admittedly also looking for drugs and alcohol. When Schaller unzipped the pack, he noticed a black pouch containing an object with a round bulb on one end, with a glass tube protruding from the pouch. A white residue was on the tube. Schaller believed that the object was drug paraphernalia. When Schaller removed this object for further inspection, Bulacan said, "You don't need to see that," and attempted to take the object from Schaller. Schaller then advised Bulacan that she was being detained for possessing drug paraphernalia and possibly narcotics.

Schaller continued to search Bulacan's pack and found a tin container containing twenty-one bags of crystal-methamphetamine. Schaller admits that by this time it was clear that there were no weapons in Bulacan's pack. Nonetheless, the pack could still have contained explosives so he continued his search. Schaller found additional paraphernalia and drugs in the side pocket of the pack, including a pipe and plastic bags containing drugs.

The items found in Bulacan's pack were inventoried. The drugs and drug paraphernalia were confiscated, and Bulacan was allowed to leave. Based on the evidence obtained in this search, the United States Attorney filed charges against Bulacan for possession of methamphetamine with intent to distribute.

Bulacan moved to suppress the drugs found in the search, arguing that the regulations underlying the administrative scheme were unconstitutional. The district court agreed and granted the motion. On appeal, the Government argues that the evidence is admissible because it was found within the scope of a search for which there was a proper administrative motive.

## II. *Issue Presented*

■ The Government argues that the issue in this case is whether incriminating evidence found in plain view by a security officer acting within the scope of a proper administrative search for weapons and explosives should be suppressed because the officer was also looking for drugs.[1] This Court

---

1. The district court held that an administrative search for drugs, alcohol, and gambling materials is unreasonable because the Government's interest in banning these items is outweighed by

has consistently held that if the scheme under which the administrative search is conducted is constitutional, the subjective motive of the individual conducting the search will not invalidate the search. *See United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir.1993) ("When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation."). Therefore, the Government argues that the evidence found in plain view in this administrative search is admissible, whether or not Schaller had a dual motive when conducting the search.

The Government's argument that evidence found in plain view during a valid administrative search is admissible, regardless of the officer's subjective motive in conducting the search, does not address the question presented by this case. The issue is not whether the officer's subjective motive invalidates the search. The issue is whether the regulation under which the search was conducted is constitutional.

The regulation authorizing the search provides that packages of persons entering federal property are subject to inspection. *See* 41 C.F.R. § 101–20.301. This regulation neither indicates what items may be the subject of the search, nor limits the discretion of the officers conducting the search. *See id.* As implemented at the Federal Building in Pearl City, the scope of the administrative search included not only the proper subject of weapons and explosives, but also arguably improper subjects—narcotics, alcohol, and gambling materials.

III. *The Fourth Amendment's Limitations on an Administrative Search Scheme*

■ It is well established that searches conducted as part of a general regulatory scheme, done in furtherance of administrative goals rather than to secure evidence of a crime, may be permissible under the Fourth Amendment without a particularized showing of probable cause. *See United States v.*

the intrusiveness of the search. For the purposes of this appeal, the Government does not chal-

*Davis*, 482 F.2d 893, 908 (9th Cir.1973). Limited administrative searches may be conducted at the border, *see, e.g., United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), in airports, *see Davis*, 482 F.2d at 893, and in state courthouses, *see McMorris v. Alioto*, 567 F.2d 897 (9th Cir.1978).

■ Because these searches require no warrant or particularized suspicion, an administrative search scheme invests the Government with the power to intrude into the privacy of ordinary citizens. This power carries with it a vast potential for abuse. *See United States v. Soyland*, 3 F.3d 1312, 1316 (9th Cir.1993) (Kozinski, J., dissenting). Therefore, courts must take care to ensure that an administrative search is not subverted into a general search for evidence of crime. *See Davis*, 482 F.2d at 909.

■ While administrative searches are an exception to the Fourth Amendment's warrant requirement, they are not an exception to the Fourth Amendment's standard of reasonableness. *See id.* at 910. Because of the potential for abuse, courts have exercised care to see that these searches are not unduly extended. *See McMorris*, 567 F.2d at 899. Courts apply a balancing test to determine whether an administrative search meets the Fourth Amendment's reasonableness requirement. Under this test, courts balance the need to search against the invasion which the search entails. *See Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). "To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Davis*, 482 F.2d at 910.

■ Further, an administrative search scheme has long term implications. Therefore, in determining whether the scheme is valid, the Court should consider the entire class of searches permissible under the scheme, rather than focusing on the facts of the case before it. *See United States v.*

lenge this finding.

*$124,570 U.S. Currency,* 873 F.2d 1240, 1244 (9th Cir.1989) ("*$124,570* "). The scheme is only valid if "the search serves a narrow but compelling administrative objective," and "the intrusion is as 'limited .... as is consistent with satisfaction of the administrative need that justifies [it].' " *Id.* at 1244–45 (quoting *Davis,* 482 F.2d at 910).

Here, the administrative search at the Federal Building was primarily for weapons and explosives. The administrative search was conducted in light of the heightened danger following the Oklahoma City bombing. The Ninth Circuit previously found that submission to a limited administrative search for explosives and weapons is a proper prerequisite to entering a public building. *See McMorris,* 567 F.2d at 899–901. Unlike *McMorris,* however, here Security Officers were also instructed to search for narcotics. The question faced is therefore twofold. First, whether the presence of an unlawful secondary purpose invalidates the administrative scheme. Second, whether the secondary purpose at issue here is unlawful.

### A. *Plain View Seizure*

■ It is well established that a law enforcement officer may seize items found in "plain view." The interests protected by the Fourth Amendment are diminished when an object is found in "plain view." Once an officer has observed an object in "plain view," the owner's privacy interest in that object is lost. Therefore, the owner's remaining interests are merely interests of possession and ownership. *See Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). The Supreme Court has weighed the intrusion on these interests created by the seizure of an object found in plain view against the government's interests, and found that when an obviously incriminating object is found in plain view, it may be seized without a warrant. *See id.*

■ Nonetheless, seizure is not necessarily justified merely because the object appeared in "plain view" in the course of a search. As the Supreme Court has stated:

[I]t is important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

*Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ Therefore, the Supreme Court has limited warrantless seizures under the "plain view" doctrine to situations where the officer had a legal right to be at the location from which the object was plainly viewed. *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In addition, to justify the seizure, the incriminating nature of the object must be immediately apparent and the officer must "have a lawful right of access to the object itself." *See Horton,* 496 U.S. at 137, 110 S.Ct. 2301. The initial intrusion can be justified by a warrant or by one of the recognized exceptions of the warrant requirement. *See Coolidge,* 403 U.S. at 465, 91 S.Ct. 2022. It is well established that individuals have a Fourth Amendment privacy interest in containers and bags. *See United States v. Chadwick,* 433 U.S. 1, 11, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Therefore, to meet the requirements of the Fourth Amendment, Schaller's search of the pack must have been pursuant to a warrant or under a valid exception to the Fourth Amendment warrant requirement. *Cf. Coolidge* 403 U.S. at 465, 91 S.Ct. 2022; *United States v. Licata,* 761 F.2d 537, 544 (9th Cir. 1985).

■ Here, once Schaller was searching the pack, the incriminating nature of the pipe and drugs was immediately apparent to Schaller. Nonetheless, for the seizure to fall within the plain view exception, the initial search must have been lawful. Otherwise, Schaller would not have been viewing the items from a place where he had a right to be.

The only exception to the warrant requirement urged by the Government is the exception for a valid administrative search. For purposes of this appeal the Government does not argue that Bulacan consented to the search. Further, the initial search of the

pack cannot be justified as a search incident to arrest because Schaller did not have probable cause to arrest Bulacan at the time the search commenced. Therefore, unless Schaller was conducting a valid administrative search, the "plain view" doctrine does not justify the seizure of the evidence.

### B. The Effect of an Unlawful Secondary Purpose

This Court held that an unlawful secondary purpose invalidates an otherwise permissible administrative search scheme in *$124,570*. See *$124,570*, 873 F.2d at 1247. *$124,570* addressed the validity of administrative searches for weapons in the carry-on bags of airline passengers. *See id.* at 1240. The *$124,570* court acknowledged that an administrative search for weapons and explosives is valid. *See id.* at 1246. The court, however, found that where the scope of the search was no longer for purely administrative purposes, but included criminal investigatory purposes, it could no longer be justified as an administrative search. *See id.* at 1246 n. 5.

In *$124,570*, the Flight Terminal Security officers ("FTS officers") executing the searches had a dual purpose when conducting the search. In *$124,570*, the United States Customs Service and Port Police had a policy of giving FTS officers a $250 reward for reporting a passenger carrying over $10,000 in currency. *See id.* at 1241.

With this policy in place, a dark mass was revealed when the defendant's briefcase passed through an airline's x-ray scanner. *See id.* The FTS officer asked the defendant to open the briefcase, revealing a large sum of money. *See id.* The FTS officer returned the briefcase to the defendant and allowed him to proceed on his scheduled flight from Seattle to Los Angeles. *See id.* The FTS officer notified the appropriate authorities and the defendant was subsequently arrested in conjunction with this currency. *See id.* at 1241–42.

Holding that this search was invalid, the *$124,570* court noted that the FTS officers had very broad latitude in determining whether or not to search a package. *See id.* at 1245. The court reasoned that if the sole purpose of the search was to find weapons or explosives, the court could defer to the guard's judgment regarding when to search a bag. *See id.* The addition of the dual motive created a different set of facts because "the decision to open a particular briefcase may be motivated by the desire to comply with the FTS's cooperation policy." *See id.* Therefore, the FTS officers might choose to search bags more often or to do more extensive searches because of the dual motive. *See id.* at 1246. Because the dual motive extended the scope of the administrative search beyond the reasonableness standard of the Fourth Amendment, the court held that the search was invalid. *See id.* at 1247.

The Government argues that *$124,570* stands for the proposition that a search conducted with both a proper and an improper motive is invalid if the improper motive expands the scope of an administrative search. Therefore, the Government argues, *$124,570* does not apply here, because Schaller was properly searching for weapons as well as drugs and did not search in any compartments that could not have contained explosives. Further, the Government distinguishes $124,570 on the ground that the $250 reward provided an "almost irresistible incentive" for the FTS officers to improperly expand the scope of their searches.

We find that the concerns expressed by the *$124,570* court are equally applicable to the administrative search at issue here. As in *$124,570*, the scope of a search for weapons and explosives could be co-extensive with a search for drugs. In both situations, however, the officers carrying out the search have broad discretion in deciding what items to search for and how carefully to search for those items. In *$124,570*, the court noted that:

> [i]f the officers have only one objective— detecting firearms and explosives—we can safely defer to their judgment, as they would have no reason to open packages unless they contained something potentially dangerous. It is much different where the agents have a dual objective; the decision to open a particular briefcase may be motivated by the desire to comply with the FTS's cooperation policy.

*Id.* at 1245. Therefore, where officers have broad discretion as to the parameters of the search, the addition of an impermissible motive extends the scope of the search, regardless of whether the items searched could have been subject to a valid administrative search.

■■■ Here, the testimony shows that the officers had broad discretion in deciding which bags to search and which containers to open. Further, it is undisputed that the officers conducting the search were instructed to search not only for weapons and explosives, but also for narcotics. The lack of a monetary reward does not eliminate the concerns expressed in *$124,570*. Therefore, just as in *$124,570*, the scope of the search is extended because the Security Officers had an impermissible motive and broad discretion regarding the extent of the search.

The Government argues that, under the district court's interpretation, *$124,570 is* incompatible with Ninth Circuit cases that hold that an improper secondary purpose does not invalidate an otherwise proper administrative search.[2] In support of this argument, the Government relies primarily on three cases in which dual purpose administrative searches were upheld by the Ninth Circuit:

*United States v. Soto–Camacho,* 58 F.3d 408 (9th Cir.1995); *Bowhay,* 992 F.2d at 229; and *United States v. Watson,* 678 F.2d 765 (9th Cir.1982).

*Bowhay* involved an inventory search that comported with the constitutional limitations on inventory searches established by the Supreme Court in *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). The limitations that the Constitution imposes on inventory searches distinguish the search conducted in *Bowhay* from the search conducted here. The Supreme Court has approved warrantless inventory searches in part because "no significant discretion is placed in the hands of the individual officer: he usually has no choice as to the subject of the search or its scope." *South Dakota v. Opperman,* 428 U.S. 364, 384, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). In *Wells,* the Supreme Court clarified that an officer may have some discretion when conducting an inventory search "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Wells,* 495 U.S. at 3–4, 110 S.Ct. 1632 (quoting *Colorado v. Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)). The

---

**2.** The Government also argues that this interpretation would be incompatible with the Supreme Court cases of *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) and *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). These cases, however, can be distinguished from *$124,570*.

In *Whren,* drugs had been discovered in conjunction with a temporary detention of a motorist arising out of an allegedly pretextual traffic stop. The defendant argued that the proper Fourth Amendment test for traffic stops is whether a police officer, acting reasonably, would have made the stop for the reason given. *See id.* 517 U.S. at 810, 116 S.Ct. 1769. The *Whren* Court held that the constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officer involved. *See id.* at 813, 116 S.Ct. 1769.

In *Horton,* the Supreme Court addressed whether the warrantless seizure of evidence of crime that is in plain view is prohibited by the Fourth Amendment when the discovery of the evidence is not inadvertent. *See Horton,* 496 U.S. at 130, 110 S.Ct. 2301. In *Horton,* a police officer obtained a search warrant to search the home of a defendant suspected of having committed armed robbery. *See id.* at 130–31. While the affidavit supporting the warrant described

the weapons used in the robbery, the warrant only authorized a search for the stolen property. In conducting the search, the officer found weapons in plain view and seized them. *See id.* at 131, 110 S.Ct. 2301. The defendant subsequently objected to the admissibility of the weapons on the ground that the officer admitted that while he was searching for the stolen property, he was also searching for other evidence; therefore, the seized evidence was not discovered "inadvertently." *See id.* The Court rejected this argument, holding that the Fourth Amendment does not prohibit the seizure of evidence in plain view, even though the evidence was not discovered inadvertently. *See id.* at 141–42, 110 S.Ct. 2301.

These cases are distinguishable from the situation at bar. Here, the defendant is arguing that the administrative search is invalid because the regulations upon which it was based are unconstitutional. Therefore, the defendant is arguing that the entire administrative search scheme is unconstitutional. In *Whren* and *Horton,* there was no question that the exceptions under which the searches were conducted were valid exceptions. The only question before the Court was whether, given an otherwise valid exception to the warrant requirements, the state of mind of the officer conducting the search would invalidate the search.

*Wells* Court outlined the limits of the discretion that may be allowed, stating:

> A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. . . .

*Id.* at 4, 110 S.Ct. 1632.

Applying this standard, the *Wells* Court struck down the inventory search at issue because there was "no policy whatever with respect to the opening of closed containers encountered during an inventory search." *Id.* at 4–5, 110 S.Ct. 1632. The Court held that absent such a policy, the search did not satisfy the Fourth Amendment and evidence obtained in the search should be suppressed. *See id.*

In *Bowhay,* the court considered whether a search that met the *Wells* standards was invalidated because the officer conducting the search had a dual motive. The *Bowhay* court first noted that the discretion given the officer was similar to that approved by the *Wells* Court because the police department had a general policy of searching all items for inventory purposes. *See Bowhay,* 992 F.2d at 231. Because the department policy required the officer to search all of the items in question, the incriminating items would have been found regardless of the officer's dual motive. The *Bowhay* court therefore held

> In this case, the department's policy was to search everything; the officer had no discretion. Because of this, the presence of an investigative motive does not invalidate the inventory search. Since we uphold this search as a valid inventory search, we do not consider the other proffered justifications for the search.

*Id.*

In contrast, in the administrative search of Bulacan's pack, the Security Officers were given no objective criteria upon which they were to base their decisions regarding whether to search a container. Instead, the determination as to whether to search a particular container was entirely within a Security Officer's judgment. Therefore, the underlying search gave the Security Officers a degree of discretion that was prohibited by the *Wells* Court. Had the officer in *Bowhay* had this degree of discretion, it appears that, under *Wells,* the entire search would have been invalid. Further, in contrast to *Bowhay,* because the Security Officers had complete discretion regarding which container to search, their conduct could vary depending upon their subjective motivation. Therefore, the dual motive of the Security Officers could alter the scope of the search. Finally, in *Bowhay,* the court was considering the significance of the subjective motive of an officer who had no discretion and who was conducting an inventory search under a constitutional search scheme. Here, the issue is whether the search scheme set forth in the regulations at issue is constitutional even when it directs an officer to have both a permissible and an impermissible motive and gives that officer such discretion in conducting the search.

Unlike *Bowhay,* which involved the subjective motivation of an officer who was conducting a search under a constitutional search scheme, *Watson* and *Soto–Camacho* address the validity of dual purpose administrative search schemes. In *Watson,* marijuana was discovered when the Coast Guard was conducting an administrative search of the Globe Trotter, a 40–foot sailboat, on the high seas, approximately 100 miles west of the mouth of the Gulf of California. *See Watson,* 678 F.2d at 765–66. The search was made in accordance with an administrative plan. *See id.* at 766. The sole purpose of the search was to inspect for compliance with document and safety regulations. *See id.* The boarding party was not instructed to search for narcotics, nor did it have any reason to suspect that narcotics would be found on the boat. *See id.* Nonetheless, the Government conceded that one of the purposes of the administrative scheme under which the search was conducted " 'was to attempt to

interdict the flow of marijuana....' " *Id.* at 769.

In holding that the administrative scheme underlying the search was valid, the *Watson* court rejected the dual motive argument, noting that for the purpose of the appeal,

> [w]e assume that the administrative plan which led to the stop of the GLOBE TROTTER was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification.

*Id.* at 771.

In *Soto–Camacho*, the defendant challenged the admissibility of drugs seized pursuant to an administrative search conducted at a border checkpoint. *See Soto–Camacho*, 58 F.3d at 408. At the time *Soto–Camacho* was decided, it was established that clearly visible border checkpoints to inspect for illegal immigrants were constitutional. *See United States v. Hernandez*, 739 F.2d 484 (9th Cir.1984); *cf. Martinez–Fuerte*, 428 U.S. at 543. The checkpoint in *Soto–Camacho*, however, had a dual purpose. While the checkpoint was a valid temporary immigration checkpoint, the border patrol timed its decision to activate the checkpoint based in part on intelligence regarding the movement of drugs. *See Soto–Camacho*, 58 F.3d at 412. The *Soto–Camacho* court nonetheless held that the checkpoint was valid, reasoning that, as in *Watson*, the search had an independent justification, and the scope of the search " 'did not exceed in scope what was permissible under that administrative justification.' " *Id.* (quoting *Watson*, 678 F.2d at 771).

In *Watson* and *Soto–Camacho*, the Ninth Circuit approved administrative searches that, as designed, had a secondary purpose of searching for drugs. Nonetheless, while the *Watson* and *Soto–Camacho* courts do not address this issue, the border context of these searches appears to have been the underlying factor in the courts' decisions that the dual motive administrative searches were reasonable. *Soto–Camacho* dealt with an administrative search conducted at a border checkpoint; this search was clearly related to the proximity of the border. *Watson* involved a search of a boat on the open sea.

The Supreme Court has indicated that the Fourth Amendment is weakened in the context of border searches. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (holding that a 16–hour detention based on reasonable suspicion is not unreasonable because it occurred at the international border "where the Fourth Amendment balance of interests leans heavily to the Government"). Searches conducted at border checkpoints and searches of vessels in waters providing the open sea are analyzed in light of the proximity of the border. *See Almeida–Sanchez v. United States*, 413 U.S. 266, 279, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring) (noting that searches at border checkpoints are incidental to the protection of the border); *United States v. Villamonte–Marquez*, 462 U.S. 579, 592, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983) (holding that officials may search vessels located in waters providing access to the open sea without probable cause or reasonable suspicion).

The *Almeida–Sanchez* Court discussed the factors weakening the Fourth Amendment's protection in the context of searches at border checkpoints. *See Almeida–Sanchez*, 413 U.S. at 266, 93 S.Ct. 2535. In his concurrence, Justice Powell indicated that, while border checkpoints "are not border searches in the conventional sense, they are incidental to the protection of the border and draw a large measure of justification from the Government's extraordinary responsibilities and powers with respect to the border." *See id.* at 279, 93 S.Ct. 2535. Justice Powell further noted that the Fourth Amendment influence at these checkpoints is further weakened because the searches are of automobiles. "The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building." *Id.; see also Martinez–Fuerte*, 428 U.S. at 543, 96 S.Ct. 3074.

Further, Congress has granted to the Executive plenary authority to conduct routine border searches to prevent the introduction of contraband into the country. *See Montoya de Hernandez*, 473 U.S. at 537, 105 S.Ct. 3304. The Court has noted that, under this power:

> [r]outine searches of the persons and effects of entrants are not subject to any

requirement of reasonable suspicion, probable cause, or warrant.... Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever.

*Id.* at 538, 105 S.Ct. 3304 (footnote and citations omitted).

These cases demonstrate that the Government has extraordinary powers to search for drugs in the border contexts at issue in *Watson* and *Soto–Camacho.* The Government's interests in preventing the entry of contraband at the border is substantial, and the protections of the Fourth Amendment are weakened. In *Soto–Camacho,* the privacy interest was further weakened because *Soto–Camacho* involved an automobile search, which is less intrusive than the search of a person or building. *See Almeida–Sanchez,* 413 U.S. at 278, 93 S.Ct. 2535.

In contrast, in the administrative searches conducted in *$124,570* and in the case at bar, the Government's interest in the search is not heightened by its need to protect the border. Nor has the Government's interest been weakened by Bulacan's proximity to the border. Therefore, in this case, the effect of the dual motive behind the search should be judged under the standard set forth in *$124,- 570.*

In sum, we find that when an administrative search scheme encompasses both a permissible and an impermissible purpose, and when the officer conducting the search has broad discretion in carrying out the search, that search does not meet the Fourth Amendment's reasonableness requirements. Here, as in *$124,570,* given the breadth of the Security Officer's discretion in conducting the search, the dual motive extends the scope of the administrative search beyond a mere search for weapons and explosives. This change in the scope of the search compels a reexamination of the constitutionality of the administrative search scheme. Therefore, the Court must assess the constitutionality of the regulations authorizing the search.

### C. Is the Secondary Purpose of Searching for Narcotics Constitutional?

■ The Government may search people entering sensitive facilities, such as government buildings, for explosives and weapons. *See McMorris,* 567 F.2d at 901. Such a search, however, "must be limited and no more intrusive than necessary to protect against the danger to be avoided...." *Id.* at 899.

To determine whether the secondary purpose of searching for drugs is permissible, the court must balance the need to search against the invasion which the search entails. *See Camara,* 387 U.S. at 536–37, 87 S.Ct. 1727. While the Government argues that the district court erred when it found that a dual motive search was invalid, for the purposes of this appeal, it does not argue that it may properly conduct an administrative search for drugs, alcohol, and gambling materials.

■ Searches conducted as part of a general regulatory scheme must further an administrative purpose, rather than further a criminal investigation. *See Davis,* 482 F.2d at 908. While administrative regulations prohibit the possession and use of drugs, alcohol, and gambling materials in the Federal Building, the Government has not shown that its interest in searching for these items outweighs the public's interest in privacy. Accordingly, the district court held that "an administrative search of the belongings of visitors to the Social Security Office looking for drugs, alcohol and gambling materials is not reasonable under the Fourth Amendment."

We affirm the district court's holding that the secondary purpose for the search was improper. This Court has repeatedly warned against the potential dangers of administrative searches, and noted that courts must guard against the danger that a permissible administrative search will be "subverted into a general search for evidence of crime." *Davis,* 482 F.2d at 909. Here, the intrusion on the public is great. The search subjects everyone accessing the Federal Building to a search of his or her personal belongings. Further, the Federal Building is far removed from any international border, so that the requirements of the Fourth Amendment have not been weakened. In contrast with weapons and explosives, the presence of narcotics on federal property

does not present an immediate threat to the occupants.

### D. *The District Court's Limiting Construction of the Statute*

■ As discussed above, the regulation under which the search was conducted authorizes the Security Officers to search the "[p]ackages, briefcases, and other containers" carried by persons onto federal property. *See* 41 C.F.R. § 101–20.301. The regulation does not specify the subject of the search, nor does it create an established procedure that limits discretion and sets the parameters of the search.

In implementing the regulation, the Security Officers construed this regulation in conjunction with regulations that ban alcohol, narcotics, and gambling materials, as well as with the regulations prohibiting the possession of weapons and explosives. Based upon this reading, the Security Officers were instructed to search for narcotics as well as weapons and explosives. An administrative search for alcohol, narcotics, and gambling materials, however, is not permissible under the Fourth Amendment because the intrusiveness of the search outweighs the Government's need to conduct such a search. The district court therefore found that 41 C.F.R. § 101–20.301 was unconstitutional when implemented in conjunction with regulations prohibiting alcohol, narcotics, and gambling materials. The district court, however, declined to strike down the regulation because it found that a reasonable limiting construction could be put on the regulation.

■ Where an otherwise acceptable statute or regulation raises serious constitutional problems as construed, courts will construe that statute to avoid the constitutional problems unless such construction is plainly contrary to the intent of its drafters. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see also United States v. Stansell,* 847 F.2d 609, 615 (9th Cir.1988) (holding that

regulation was not unconstitutionally overbroad because a reasonable limiting construction can be applied).

Here, the regulation as applied authorized an unreasonably broad administrative search in violation of the Fourth Amendment. The district court therefore applied a limiting construction under which the regulation permitted a constitutional administrative search for weapons or explosives. The court read the regulation in conjunction with 41 C.F.R. § 101–20.313 And 18 U.S.C. § 930, which prohibits entering federal property carrying firearms or explosives, and requires that notice of such prohibition be posted conspicuously. Construing 41 C.F.R. § 101–20.301 with these statutes, the regulation allows the Government to make an administrative search for weapons where intent to do such a search is clearly posted. Under *Davis* and *McMorris,* the regulation, if so limited, would authorize administrative searches that were constitutional in their scope.

We agree with the district court's limiting construction of the regulation. Because the regulation as applied to Bulacan represented an unconstitutional expansion of an administrative search, the district court's decision to suppress the evidence is also affirmed.

*Affirmed.*