**UNITED STATES of America,
Plaintiff,**

**v.**

**Vicki Irene KERR, a.k.a. Vicki F. Kerr; Ashley M. Bunton,
Defendants.**

**No. 2:16–PO–0079–JTR–1, No.
2:16–PO–0108–JTR–1**

United States District Court,
E.D. Washington.

Signed 07/18/2017

CVB, AUSA, U.S. Attorney's Office, Spokane, WA, for Plaintiff.

John Stephen Roberts, Jr., Federal Defenders, Spokane, WA, for Defendants.

## ORDER GRANTING DEFENDANTS' CONSOLIDATED MOTIONS TO SUPPRESS EVIDENCE

### JOHN T. RODGERS, UNITED STATES MAGISTRATE JUDGE

It has been common knowledge for decades that one's belongings will be searched before boarding an airplane, to protect airplanes from being hijacked or blown up. But how many people know that when entering a private building in a private office park, in order to fill out a Social Security application, federal authorities will search your bag, and every container inside your bag, and every container inside that container, no matter how small?

The matter came before the Court on April 14, 2017, April 28, 2017, and May 11, 2017, for an evidentiary hearing regarding Defendants' consolidated motions to suppress evidence of personal drug possession seized from their respective purses during such a search conducted at the entrance to the Social Security Administration (SSA) office in Spokane, Washington.

Defendants contend that the searches were overbroad and that this Court should construe reasonable limits on a search under these circumstances.

The Government responds that the evidence is admissible because it was discovered in "plain view," during an administrative inspection appropriately tailored to a legitimate governmental interest.

Defendants were present and represented by Assistant Federal Defender John

Stephen Roberts, Jr., and Legal Intern Lindsey Wheat. Assistant U.S. Attorney Tyler Tornabene and Legal Interns Jocelyn Sullivan and Jason Moscowitz represented the United States.

The Court has heard testimony over the course of three days, reviewed the briefs of the parties, and examined the exhibits.

As detailed below, the Court grants Defendants' motions to suppress because the administrative searches conducted in these cases were not the least intrusive means consistent with current technology, Defendants did not have adequate notice of the actual search, and Defendants did not manifest their consent.

## THE THREAT THIS SEARCH SEEKS TO ELIMINATE

The Government offered the testimony of Joseph Misher, Division Director of the Cyber Physical Operations Division of the Federal Protective Service. Mr. Misher explained that the security measures for a given site are determined after assessing the risk of terrorist attack, criminal mischief, and other dangers. Further considerations include, but are not limited to, the neighborhood where the facility is located, its history, the kind of work conducted at the facility, the population the facility serves, and the opinions of a committee of tenants of that facility. On a range of 1 to 5, with the latter being the most serious risk, the SSA building in question is assigned a Risk Level 2.

There was testimony that SSA facilities generally experience a high incidence of "assaults." The assaults were not further broken down as to severity or weapon use, though witnesses *sua sponte* used the phrases "assault-and-disorderly" or "hands, foot and feet" when offering this evidence.

The Government also offered the testimony of Joshua Vayer, Division Director of the Protective Operations Division, from the Federal Protective Service headquarters in Washington, D.C. He testified that the search protocol was solely to screen for bombs, weapons and destructive devices. He further opined that multiple individuals could enter a facility with seemingly innocuous items which later could be gathered and assembled to make a bomb, so it was proper to screen for components of weapons and bombs.

Mr. Vayer testified that a short length of wire or a single AAA battery could be a "bomb component," that exposure to 3 to 5 micrograms (a microgram is a millionth of a gram) of Ricin or .001 microgram of botulinum toxin per kilogram of bodyweight is fatal to 50% of people so exposed, and that explosives can be as thin as a sheet of paper in between the pages of a magazine. He was unable to conceive of a space or container too small to contain a life threatening item.

## THE FACILITY TO BE PROTECTED

The building in question was leased to the SSA and was within a privately owned building in a private business park.

All visitors to the building enter through exterior doors into a general public elevator lobby. They are next individually admitted through a second door to an interior anteroom. There are a number of notices affixed to the wall next to this door into the anteroom. These notices prohibit certain items on the premises, state that bags and other containers will be inspected, and include two pages of text in 12 point type setting out certain federal regulations. *See* Government Exhibit 7–1.

The anteroom is staffed by private contractors. They are called Protective Service Officers (PSOs). They are not law enforcement officers, but they wear a uni-

form typical of law enforcement. At one time they received sixteen hours of classroom training, but the current contract provides for 8 hours of classroom training, plus written materials and on the job observation, as well as spot checks and training by the contractor's roving supervisors.

There are two PSOs in the anteroom. There is also a walk-through magnetometer that examines one's person for the presence of ferrous metal, similar to those seen in airports. Unlike airports, the SSA building in question does not have an x-ray machine to examine purses and other items carried by persons. Instead, bags and parcels are inspected by PSOs by hand on a table provided for the purpose.

People are admitted to the anteroom one at a time by a PSO, who requires photo ID and confirms they have business with the SSA, then tells them that they will undergo an "administrative inspection," and to empty their pockets and place all belongings in a bin on the table.

Inspector Curtis of the Federal Protective Service, who trains PSOs, testified that PSOs are taught to "identify everything in the bag," and that there is no limit on the size of the containers that will be searched.

### ADMINISTRATIVE SEARCHES

■ The Fourth Amendment to the U.S. Constitution generally requires a search of a person or property by the government be reasonable. A governmental search lacking a particularized warrant issued by a neutral and detached magistrate upon a showing of probable cause, is presumed unreasonable and therefore unconstitutional. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specially established and well-delineated exceptions.").

■ However, a warrantless "administrative search" can be held reasonable and constitutional. The burden is on the Government to show that such a search is in furtherance of a specific and legitimate non-criminal goal, is no more extensive nor invasive than necessary to address that goal, does not give discretion to the searching individual, and does not have as a collateral purpose collection of criminal evidence. *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005); *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998); *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973).

■ An airport security screening search is constitutionally reasonable provided it "is no more extensive or intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives ... [and] is confined in good faith to that purpose. *United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007) quoting *Davis*, 482 F.2d at 913.

■ This Court is satisfied that the "administrative inspection" in this case is in furtherance of a legitimate governmental goal (to prevent destruction and injury in government facilities) and does not have a secondary or unofficial goal of gathering evidence for a criminal prosecution.

### LIMITS TO THE SEARCH

Defendants urge this Court to find there are "reasonable limits" to the extent of both an "administrative inspection," and to the discretion officers have in conducting the search. Two considerations prohibit this conclusion.

First, given the evidence of the minute size of bomb components or virulent agents, and their rational relation to the

purpose of the search, this Court can articulate no dimensional threshold beyond which the search is unreasonable, and no workable "totality of the circumstances" test that would reliably signal when government agents have gone too far.

Second, discretion vested in the searcher is fatal to the constitutionality of an administrative search. *See Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

## "CONSISTENT WITH CURRENT TECHNOLOGY"

Case law conditions administrative searches on being no more intrusive than necessary, and *"consistent with current technology." Aukai, supra, Davis, supra* (emphasis supplied). It is only rational to interpret the term "consistent with current technology" to apply to both the *object* of the search and the *means* of the search (pat-down, x-ray, etc.).

■ The Government in this SSA facility employs a "hand inspection" of individuals' bundles and belongings, which in Ms. Bunton's case included opening an eyeglass case, which was carried inside a purse. In Ms. Kerr's case, the "hand inspection" included opening a 2″ x 2″ pill bottle, which was inside a 3″ x 4″ wallet that was zipped closed, which was in turn inside a purse.

This innocuously named "administrative inspection" is nevertheless an extraordinarily invasive undertaking. It is significantly more invasive than the x-ray screening at an airport, because that method evaluates bags and parcels as a whole unless something suspicious is identified in the x-ray. Here, all containers are opened, whether or not they are suspicious. Such a "hand inspection" sanctions the removal and handling, in a public place, of everything, including under clothes, legal materials and medications.

In referencing x-ray machines in the training manuals, the Government implies that x-ray technology is known and acceptable. *See* Government's Exhibit 1–6. Inspector Curtis acknowledged that x-ray would be a more efficient way to search for firearms or explosives and would avoid the need to open certain containers.

The Government indicates the decision to employ hand searches is essentially a "funding" decision, and that it is unwilling to fund an x-ray machine and/or modify the space that would be necessary to accommodate the machine. However, the case law speaks to current "technology," not current budgetary priorities.

As Judge Kozinski observed, "[n]ew technologies test the judicial conscience." *See United States v. Kincade*, 379 F.3d 813, 871 (9th Cir. 2004) (dissenting opinion). The progressive miniaturization of destructive technology challenges courts to use technology to avoid the increasingly invasive searches that such miniaturization would otherwise lead us to.

The search in this case was not conducted with current technology. A widely available x-ray machine has the power to maintain the realm of privacy by effecting an equally effective but less intrusive means of searching entrants to the SSA building.

Accordingly, the Court finds the administrative searches at issue were not the least intrusive consistent with current technology.

## NOTICE AND CONSENT

■ Administrative searches are not entirely divorced from notice or consent, however streamlined or even presumed that step may be.

The "administrative search exception" began as a way for regulatory agencies to

inspect aspects of organizations which merited scrutiny because of a direct relation to public safety and welfare. It typically involved a noncriminal agency, such as a food inspector examining employees' "health cards," or a fire inspector reviewing the maintenance of a sprinkler system. Consent to such intrusions was deemed a condition of being licensed to engage in such regulated activities

In *McMorris v. Alioto*, 567 F.2d 897 (9th Cir. 1978) the court held that ("[e]ven where the necessity of a limited regulatory search has been established and the manner of conducting the search has been found reasonable, we have sustained such searches only where persons subject to the search have given what we have termed "implied consent") (quoting *Davis*, 482 F.2d at 913).

Today, what is more accurately called an "entry search," though it is often referred to as an administrative search, is distinct from the above described inspections of closely regulated businesses. *See Kincade*, 379 F.3d at 822–823. These entry searches are known as "exempted areas" and are generally unhindered by the warrant requirement. However, even a warrantless search must still meet the constitutional standard for reasonableness. *Aukai*, 497 F.3d at 962.

Consent initially clouded the concept of the warrantless searches conducted at airports. In the *Davis* case, *supra*, in 1973, the Court of Appeals found that an airport search which uncovered a firearm was for a legitimate purpose and did not per se violate the Fourth Amendment, but nevertheless remanded the case to determine whether the search was in fact consensual. By the time of the *Aukai* case, *supra*, in 2007, the Court had no difficulty holding that consent to search was impliedly given by walking through the magnetometer at an airport.

Courthouses, government facilities, and other sensitive buildings typically have magnetometers at their entrances. Courts have reasoned that because lawyers are well educated, they are deemed to have understood and consented to undergo a screening when they choose to work in a courthouse. *McMorris v. Alioto*, 567 F.2d 897 (9th Cir. 1978). Similarly, courts recognize that air travelers are worldly and informed and, in any event, often have alternatives to air travel before they "choose" to undergo screening.

Consent by any other name implies some deliberation. There is little difference between "choosing" to participate in certain regulated endeavors, and the "consent" to put one's bag on the conveyer belt at the airport security checkpoint. Neither occurs without a degree of deliberation and volition, however streamlined.

A theory of "consent" may not be valid if based on the assumption that individuals entering the SSA office have chosen to be there.[1] The office in question is the only SSA office in Spokane, and many visitors are required by law to apply for benefits.[2]

---

1. The SSA's Program Operations Manual System (POMS) *specifically provides situations that require a face-to-face interview. See* POMS GN 00203.003.

2. State authorities expressly condition a grant of state benefits on the recipient applying for federal SSA benefits. *See, e.g.,* Wash. Admin. Code § 388–400–0060 ("(2) You aren't eligible for aged, blind, or disabled cash benefits if you ... (d) Refuse or fail to pursue federal aid assistance, including but not limited to medicaid, without good cause ... (f) *Refuse or fail* to follow through with the SSI application as required in WAC 388–449–0200 without good cause ... (h) Are eligible for supplemental security income (SSI) benefits ... (j) Failed to follow a Social Security Administration (SSA) program rule or application requirement and SSA denied or terminated your benefits."); Wash. Admin. Code § 388–449–0200 ("(1)

The Government has acknowledged that in formulating the security measures to be used at a given facility, it considers the "neighborhood" where a facility is located and the "customers" likely to use the facility. The SSA facility in question is located near homeless shelters and other providers of social services. The population seeking Social Security services is frequently comprised of indigent or homeless persons who are often carrying all their possessions.[3] There is no safe place to leave belongings while conducting business in this SSA building. Conceivably, people seeking Social Security services may be mentally or physically disabled by definition, and their capacity to perceive or understand instructions somewhat limited.[4]

Further, some cases question whether the decision to hand over a bag is voluntary when requested by a uniformed law enforcement officer in a closed room. *See United States v. Ruiz–Estrella*, 481 F.2d 723 (2nd Cir. 1973).

Moreover, consent means nothing without an appreciation of what one is consenting to. Notice of the "administrative inspection" in the case at bar elevates form over substance. The Ninth Circuit has held that the measure of whether a posting is "reasonably calculated" to warn the public of a prohibition is not an assessment of the government's effort in making the posting, but rather the effect the notice had on the pubic. *United States v. Lunstedt*, 997 F.2d 665, 668 (1993) (upholding jury instruction

that advised jury that, "to be posted conspicuously, the notice had to be reasonably suited to warn the public of the prohibition.") (internal quotes omitted). Even the term "search" is studiously avoided by the PSOs. Instead, they are trained to use the word "inspection" instead of "search."

An administrative search is not a game of "Gottcha." It is to identify and exclude certain materials. If it were anything else, the search would be invalid for want of probable cause or consent. It only advances the stated purpose of the "inspection" to clearly tell individuals how extensive the search will be. Two pages of legalese on a nearby wall is no more informative than the boilerplate contained in the "Terms of Service" of a cell phone contract.

The Federal Protective Services Officer (FPO) who trained the PSOs involved in this case, Inspector Curtis, testified that the PSOs are trained to tell people that they will be subject to an "administrative inspection," and that once the inspection starts, they must remain until the inspection is concluded.

The PSOs are not trained, however, to inquire whether the person to be searched understands or agrees. PSO Hamley, who conducted the search of Defendant Bunton, testified that he does not advise people of their right to refuse. Inspector Curtis further testified: "[t]hey don't ask do you understand, or do you agree. We don't do that." PSO Keene, who searched Defen-

<hr>

You may receive [aged, blind or disabled] benefits while you are waiting to receive supplemental security income (SSI) benefits only when you: (a) Have filed your SSI application with the Social Security Administration (SSA), follow through with SSA directions and requirements to process your application including keeping all interview and consultative examination appointments, and do not withdraw your application . . . .").

**3.** The traffic of transient and homeless individuals through Social Security Offices is high enough that the POMS provides instructions on how to interview transient and homeless individuals and document their housing status. *See* POMS SI 00835.060.

**4.** The Social Security Administration was created to administer the old-age, survivors, and disability insurance program and the supplemental security income program. 42 U.S.C. § 901(b).

dant Kerr, acknowledged that training and policy materials specified that "[t]he visitor must be given the opportunity to decline the inspection *after they are informed of the inspections requirements*."

There is no indication that the Government takes any steps to insure that the person to be searched understands (1) the essential aspects of an "administrative inspection" or that the Government will search all packages and all containers inside those packages, and any containers inside those containers, or (2) that the person may leave and come back another time.

The Government walks a very fine line when seeking to uphold a search without consent or a warrant, which depends for its validity on not seeking "criminal evidence," yet probes ever deeper for what can only be considered "criminal materials." The Ninth Circuit has repeatedly observed that because administrative searches can be conducted without a warrant or particularized suspicion, the Government is put in a position of power with a vast potential for abuse. *See Bulacan*, 156 F.3d at 967. Under such circumstances, consent and notice must have a role in protecting an individual's privacy from this potential abuse.

Based on the foregoing, the Court finds Defendants did not have adequate notice of the actual search and did not manifest their consent in these cases.

Accordingly, **IT IS ORDERED** Defendant Kerr's motion to suppress, **ECF No. 17 (2:16–PO–0079–JTR)** and Defendant Bunton's motion to suppress, **ECF No. 17 (2:16–PO–0108–JTR)**, are **GRANTED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and furnish copies to counsel.